[Crim. No. 22357. Dec. 31, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN CLARK SILBERTSON, Defendant and Appellant.

**COUNSEL**

Jimmie E. Tinsley, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, James T. McNally, Edmund D. McMurray, Susan Rankin Bunting and Lisa Lewis Dubois, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, J.*—**Defendant Steven Clark Silbertson appeals from a judgment of death imposed under the 1978 death penalty law (Pen. Code, § 190 et seq.)[1] for the murder of Randy Watkins on June 24, 1979. In September 1981, a jury convicted him of first degree murder (§ 187) and robbery (§ 211). A special circumstance allegation that the murder was committed during a robbery (§ 190.2, subd. (a)(17)(i)) was found to be true, as was an allegation that defendant used a firearm in the commission of both felonies (§ 12022.5). The jury returned a verdict of death.

We affirm the judgment as to guilt and set aside the robbery-murder special circumstance under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1] All statutory references are to the Penal Code unless otherwise indicated.

## I. *Facts*

### A. *Prosecution Case*

Defendant and his wife, Donna, were married on January 24, 1979, a few days after Donna had broken off her relationship with 18-year-old Randy Watkins, the eventual victim. Defendant had inherited some money from his father and Donna had received an automobile accident settlement. Using these funds, the couple embarked on a honeymoon to Texas and other states.

After a week of honeymooning, Donna realized that the marriage was a mistake. On the pretext of going home to visit her father, Donna flew to Modesto and spent two nights with Randy. She then went to Fresno, where she received a telephone call from defendant. She decided to rejoin him in Mississippi; from there, the two resumed their honeymoon.

Admitting to defendant that she had been sexually active while in Modesto, Donna told him that it had been with an old boyfriend named Richard.[2] Between her return to defendant and the time Randy was killed, the couple argued repeatedly about Randy—defendant knowing that Donna "cared a lot" about him. Donna expressed her desire to return to California to rekindle her relationship with Randy.

The couple settled in Reno in March 1979. Donna worked first at a market and then at a 7-Eleven store. Defendant remained unemployed. The two lived primarily on money they received from defendant's grandmother.

In April 1979, the Silbertsons drove to Modesto. While driving in Modesto, defendant glanced into his rearview mirror and noticed Randy driving in a car behind them. Paul Court, a passenger in Randy's car, asked Randy to pull up beside the Silbertsons so that he could ask Donna about a tape he had loaned her.[3] Donna denied having the tape and defendant told Paul to mind his "own damned business." Paul and Randy made an obscene gesture toward the Silbertsons who responded in kind. Defendant followed Randy's car to a pool hall and told Randy to get out. A fistfight ensued, with Paul joining to aid Randy. Donna drove off and returned just as the fight was ending. Defendant asked Donna to hand him the knife in the glove compartment. She refused and the couple left, eventually returning to Reno.

By the latter part of June 1979—with the rent due—the Silbertsons were experiencing financial difficulties: he remained unemployed and she had

---

[2] On several occasions before trial, Donna told Modesto Police Detective Fred Vaughn that she had told defendant about the two nights with Randy, and she also testified to that effect at the preliminary hearing.

[3] Paul Court was aware of the ill-will between Randy and defendant.

been fired. On June 24, defendant talked to Donna about robbing the Reno 7-Eleven store.[4] She said "there was no way he could do it." Later in the day, they discussed the possibility of robbing the Modesto 7-Eleven on Coffee Road. He asked her when the night deposits were made and who usually made them. Donna had worked at the Modesto 7-Eleven prior to her marriage and had, in fact, met Randy there. She knew that either Randy or his partner, Darrell Kalbach, would be making the night deposit, but she did not know who would be doing it that week. During this discussion in Reno, defendant asked where the deposit would be made and stated that he was going to kill the person making it.[5]

The Silbertsons left Reno between 5 and 5:30 p.m. on June 24. Before leaving, Donna—at defendant's request—made him a stocking mask and bought him a pair of gloves. On the way to Stockton, defendant test-fired a .32 caliber pistol which he had acquired a week earlier and which he was carrying in his belt.

The couple stopped in Stockton, at the home of Louis (Chuck) Silbertson, defendant's brother.[6] Defendant told his brother and Henry Grant that he was going to rob and kill the person making the night deposit at the Modesto 7-Eleven. He asked Grant to accompany him, but Grant declined.

In defendant's pickup truck, the couple drove on to Modesto, arriving late in the evening.[7] They stopped at the Bank of America, where they waited for 10 or 15 minutes. As there was no activity, defendant suggested that they drive by the 7-Eleven store. On arriving at the store, they saw Randy leaving in his car. They followed him to the Wells Fargo Bank.[8] Defendant told Donna that he was going to get into Randy's car, have him drive somewhere else, and then kill him.[9]

---

[4]The possibility of robbing the Reno store appears only in Donna's testimony. Defendant testified at the penalty phase that there was never any mention of such a robbery.

[5]This account is based on the trial testimony of Donna. It differs in many respects from accounts she gave at other times. For example, she had previously told Detective Vaughn that she first became aware that a crime was to be committed while driving from Stockton to Modesto, not while still in Reno. She had also told Vaughn and had testified at the preliminary examination that she and defendant did not leave Reno until nighttime.

[6]Chuck testified, however, that he did not see defendant and Donna at all during their stop in Stockton on the way to Modesto.

[7]While the record does not reveal the exact time of arrival in Modesto, we infer from the overall chronology of events that it must have been between 10 p.m. and midnight.

[8]Donna had originally specified the Bank of America in the mistaken belief that the night deposit would be made there. In fact, the night deposits were made at the Wells Fargo Bank; the murder occurred in the lot adjacent to the Wells Fargo Bank.

[9]Donna initially testified that defendant told her, before arriving at the bank, "Tonight is the night I am going to get even with you for what you have done to me." She later testified that this statement had been made on an earlier occasion.

Near the bank, defendant got out of his truck, walked over to Randy's car, and entered on the passenger side. Although he had the mask and gloves with him, he was not wearing them. Donna drove the pickup into a nearby drugstore parking lot and waited, leaving the motor running and the lights on. Defendant soon returned to the pickup, telling Donna that he had killed Randy, but that "he didn't mean to pull the trigger right there, . . . he didn't mean to pull the trigger right then, that it was just, the trigger was really light." Donna interpreted this to mean that defendant had intended to have Randy drive someplace else, as she had expected him to do. She questioned defendant about fingerprints, and he told her that he had smudged them.

The couple then returned to Chuck Silbertson's apartment in Stockton. Defendant had brought back two paper bags from Randy Watkins' car; one was a green Wells Fargo Bank bag and the other contained car parts. Enroute to Stockton, Donna tossed the bag with the car parts out the window.

There are discrepancies in the prosecution witnesses' testimony as to what happened when defendant and Donna returned to Chuck's. Donna testified that defendant told Chuck and Grant that he had killed Randy and had taken the bank bag. Defendant gave an empty shell casing to Chuck as a souvenir. Chuck laughed. On opening the bank bag, defendant found over $3,000 in cash and a number of checks. He and Grant burned the checks in the barbecue. With Donna, he then went to a canal where they disposed of the gun, the bullets and the bank bag.

Chuck testified that he saw defendant and Donna that night, but denied the shell casing incident and did not remember seeing defendant count the money. Both Chuck and Henry Grant swore that Chuck first saw the money the next morning and that defendant gave Chuck $500.

Grant testified that he was awakened about 3 a.m. when the couple returned. Defendant cut open the bank bag and counted out the money. He told Grant that he had robbed a 7-Eleven store in Modesto; that he approached a young man in a vehicle making a bank deposit; that he held a gun to his head; that the man refused to give him the bag; and that "[t]he gun went off." He also told Grant, "Since you didn't help, you don't get any money."

Donna testified that on the following morning, June 25, 1979, she and defendant heard a radio broadcast telling of Randy's death. Said defendant: "At least he is dead so we don't have to worry about witnesses." Later that day, defendant and Donna returned to Reno.

Randy's body was discovered by police shortly after 1 a.m. on June 25. Officer Massey, responding to a citizen's report, observed a car parked in the Wells Fargo Bank parking lot. The driver's door was ajar and a man's leg was hanging out, touching the ground; the radio or tape deck was still playing. The cause of death was determined to be a single gunshot wound to the head. The bullet had entered the right side of the face just below the eyelid and lodged between the skin and the bone at the back of the skull. There were no other wounds. The bullet which was recovered appeared to be a .32 caliber.

About a week later, in Reno, defendant told one Danny Haggerman that he had gone to Modesto "to blow someone away." He said that he had jumped into a parked car and, before the person could say anything, pulled the trigger, shooting the victim in the head. He further stated that the victim was his brother-in-law and that he had been paid $1,000 to kill him.

In July 1979, Detective Vaughn of the Modesto Police Department interviewed Donna. She said that she and defendant had been in Reno at the time of the murder. At trial, she testified that defendant had told her to say this and had threatened to kill her "just as dead as Randy" if she said anything else. Vaughn testified that he asked Chuck in April 1981 whether his brother had told him that he had killed Randy, and Chuck said "Yes," a statement Chuck had denied having made during his own testimony.

Beverly Deeter—who had known defendant since 1974—testified that she visited him in November 1980. She told him that she had heard that he had killed someone. Defendant replied that he had gone to Modesto to kill someone named Randy because Randy had raped his wife Donna. He said that Donna had told him about the rape and that the killing took place at the bank because they wanted to make it appear that someone had shot Randy for the money. According to Mrs. Deeter, defendant discussed the killing with her on several later occasions, always speaking matter-of-factly about it.

B. *Defense Case*

Only one defense witness was called: Raymond Harter, an investigator with the Stanislaus County District Attorney's office. He testified that when he interviewed Danny Haggerman three weeks before trial, Haggerman told him that defendant had admitted killing his wife's ex-boyfriend and told him that he would kill anyone if the price was right or if he had "some kind of grudge against 'em."

## II. *Guilt Phase Issues*

*Felony-murder Rule*

The jury was instructed on two theories on which it could convict defendant of first degree murder: premeditated murder and felony murder. Defendant urges us to reject the felony-murder rule because it creates an unconstitutional presumption of malice. We settled that issue in *People* v. *Dillon* (1983) 34 Cal.3d 441, 472-476 [194 Cal.Rptr. 390, 668 P.2d 697].

*Inadequate Instructions on Jury Note-taking*

Defendant next contends that the trial court inadequately instructed the jury on the dangers of note-taking. In *People* v. *Whitt* (1984) 36 Cal.3d 724, 747 [205 Cal.Rptr. 810, 685 P.2d 1161], we recognized the risks inherent in juror note-taking and observed that it is "the better practice" for courts to give, sua sponte, a cautionary instruction on note-taking. Although the ideal instruction would advert specifically to all the dangers of note-taking,[10] we found the less complete instruction given in *Whitt* to be adequate: "Be careful as to the amount of notes that you take. I'd rather that you observe the witness, observe the demeanor of that witness, listen to how that person testifies rather than taking copious notes . . . . [I]f you do not recall exactly as to what a witness might have said or you disagree, for instance, during the deliberation [*sic*] as to what a witness may have said, we can reread that transcript back . . . ." (36 Cal.3d at pp. 747-748.)

In this case, the trial judge made the following comments to the jury: "Let's see, my bailiff has note pads that he will distribute to you. This doesn't mean that you have to take notes, but some people do like to take notes. [¶] You must bear in mind, though, that I assume that you are not professional notetakers, and if there is any question as to what was actually said the court reporter, of course, can give that information to you."

■ While these comments were not as thorough as the instruction recommended or even the one that was given in *Whitt,* they were—arguably—sufficient to inform the jurors that they did not have to take or rely upon their own notes. More importantly, we did not hold in *Whitt* that a trial court is *required* to give such cautionary instructions. Nor did we establish

---

[10]See, e.g., the instruction outlined by a New York court in *People* v. *DiLuca* (1982) 85 App.Div.2d 439 [448 N.Y.S.2d 730, 735]. Unlike New York, California has given implicit statutory approval to note-taking. (See *Whitt, supra,* 36 Cal.3d at p. 747.)

any standards for assessing the effect of the failure to give the recommended instructions.[11] The error, if any, was clearly not prejudicial.

### III. *Issues Relating to the Special Circumstance Finding*

■ The trial court erred in failing to instruct the jury that it must find that defendant intended to kill in order to find the robbery special circumstance to be true. (*Carlos* v. *Superior Court, supra,* 35 Cal.3d 131.) Under *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], this error is reversible per se unless one of a very limited number of exceptions applies. To set our analysis of the *Carlos-Garcia* issue in its proper context, it is first necessary to explain in some detail the peculiar defense theory actually advanced at trial and the reasons therefor.

In attempting to avoid an affirmative finding on the robbery special circumstance, defense counsel was faced with the apparent pre-*Carlos* anomaly that under the 1978 death penalty statute a cold-blooded, premeditated murder did not, as such, call for a special circumstance finding, while an accidental killing that occurred during the commission of a robbery did and it could result in a death sentence. Defendant had, of course, clearly robbed and killed Randy. There were no possible defenses based on alibi, self-defense, or the like—nor was a diminished capacity defense ever tendered. Because, in this pre-*Carlos* case, intent to kill seemed irrelevant to both the felony-murder charge and the robbery special circumstance, the defense had little, if any, incentive to formulate a theory around what evidence there was that defendant lacked intent to kill. On the contrary, our reasoning in *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], gave defense counsel a strong incentive to argue just the opposite: that his client's intention was to murder Randy Watkins and that the robbery was merely incidental to the homicide. Thus, the heart of the defense strategy was to deemphasize the evidence that defendant had intended to rob and that the gun may have discharged accidentally; rather, counsel argued, this was an intentional murder, the robbery being incidental to it.

The *Green* strategy was apparent even in defense counsel's opening statement to the jury: "Let me start by clearing up any mysteries that you might have about the situation in telling you my client, Steven Silbertson, shot Randy Watkins. [¶] We don't quarrel with that at all. . . . [¶] Your duty here, or your job as jurors, is not really going to be to decide whether or not he killed him, because I am telling you that he did. It is to decide

---

[11]Defendant offers no evidence as to the prejudicial effect of the "inadequate" cautionary instruction. Moreover, even if *Whitt* could be fairly construed to have created a rule requiring a cautionary instruction, defendant's reliance on *Whitt* presupposes retroactive application of *Whitt*—an issue which we did not address.

whether or not this was a killing that occurred during the course of a robbery or, in the alternative, was this a murder in which during the course of that murder, at the end of that murder, a theft was committed.''

Throughout the trial, defense counsel emphasized the long-standing animosity between defendant and Randy Watkins generated by Randy's relationship with Donna, stressed the incidents and conversations suggesting jealousy, and argued, finally, that defendant drove from Reno to Modesto primarily to kill Randy. The flavor of the defense is perhaps best captured in the following passages from his closing arguments to the jury: "Intent? Talk about intent because it is really the focal point of this case. I find it rather ironic this is the first time in my career I can agree with the District Attorney in his final argument, because the intent here is pretty darned clear. Everything that led up to the 24th was centered around [*sic*] Randy Watkins. And everything on that day was about Randy Watkins. And all the way down to Modesto who was it about? Randy Watkins. [¶] You know, if it was, if it was Steven's intent just to go out and do a robbery, as I said earlier . . . there has to be—pick a number—thousands of places to rob between here and Reno, Nevada. [¶] Was that his intent? No. His intent was to kill Randy Watkins. [¶] And whatever happened after that was incidental to it, was secondary to his primary motive of wanting to kill Mr. Watkins . . . . [¶] Just before he gets to the bank, before Steven gets to the bank he clearly expresses his intent to kill. He says to his wife, 'I am going to kill him. Tonight's the night. I am getting back at you for what you have done to me.' [¶] . . . She admitted to you several times on the stand that as they are driving to the bank she knew, she knew because he told her that her friend and lover was going to be killed. [¶] Ladies and gentlemen, that is a clear expression of his intent. And it is an expression of his intent just before, just seconds before the actual act happened. [¶] . . . His clear intent has been expressed. And to ignore that is to ignore the realities, here, ladies and gentlemen. [¶] . . . Mr. Haggerman says Steve told him that he came to Modesto—clear to Modesto—to blow away his wife's boyfriend. That is a clear expression of intent. [¶] What he intended the day before, two hours before, a year before, means nothing. His intent at the time he did it is what counts. And it is clear from all the evidence his intent was to kill and not to rob. He robbed afterwards. [¶] . . . You see, he did the murder intentionally, premeditated and deliberately, knowing full well that he was going to do it. [¶] I am asking you, ladies and gentlemen, I am begging you, to recognize that there is a doubt here about his intent to do an exclusive robbery in which incidentally someone is murdered. It is clearly not so. This man is guilty of murder, and you may so find. [¶] What I am asking you to do, ladies and gentlemen—and it is a small thing—is to find that the circumstance, the special circumstance is not true. It is not true because this was not a robbery, this was clearly a murder.''

Defense strategy notwithstanding, the prosecution continued to press for a special circumstance finding on a felony-murder theory, supported by erroneous instructions on the required intent to kill. The only possible exception to the rule of per se reversal which might possibly apply to this case is the so-called *Cantrell-Thornton* exception which, in *Garcia*, we formulated as follows: "[T]here may . . . be cases where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (36 Cal.3d at p. 556.)[12] The People assert, of course, that the issue of intent was raised, the parties presented evidence on the issue and the evidence presented established intent to kill as a matter of law.

As explained, the question of intent was indeed raised, though in a perverse fashion. Because defense counsel's strategy centered on the *Green* theory—i.e., that the robbery was merely incidental to an intentional and premeditated killing—he had no incentive to argue that defendant did not intend to kill. He certainly had no reason to present all evidence available which might have suggested that the killing was unintentional. In *Garcia, supra,* we noted that "[i]f the defendant in a pre-*Carlos* trial was unaware that intent to kill was an element of the felony-murder special circumstance, he might through ignorance fail to present evidence worthy of consideration on that matter. We could not in such cases affirm a special circumstance finding on the ground that defendant did not introduce evidence sufficient to raise a material issue." (36 Cal.3d at p. 556.) ▪ ▪▪▪ Unaware that intent to kill was an element of the felony-murder special circumstance, defense counsel may indeed have failed to present all credible evidence which might negate the element of intent—for example, additional evidence to the effect that the actual shooting was accidental.[13]

---

[12]*Garcia* recognized that *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969], also allowed for an exception " 'if the defendant conceded the issue of intent.' " (36 Cal.3d at p. 555.) Obviously, however, the court was not addressing a situation where the "concession" is triggered by an erroneous perception that it costs nothing and may, indeed, be to the defendant's advantage.

[13]That there was additional evidence which might have been presented to negate the element of intent is revealed by defendant's testimony at the penalty phase. Although not part of the record at the guilt phase, we must consider this and any other potential evidence in determining whether the failure to instruct on intent to kill is reversible error. (See *People* v. *Ramos* (1984) 37 Cal.3d 136, 148 [207 Cal.Rptr. 800, 689 P.2d 430].) In view of the misunderstanding evidenced by part II of Justice Mosk's dissent, we emphasize that we do not refer to evidence offered at the penalty phase for the purpose of *curing* instructional error at the guilt phase. To the contrary, we point to such evidence to demonstrate that the prejudice that flowed from the error was not imaginary, but real.

At the penalty trial, defendant admitted that he was jealous of Randy and that he talked to Donna about robbing the Modesto 7-Eleven "because the best way of getting back at Randy was to make the encounter look like a robbery." On the night of the killing defendant got into the car with Randy and asked him if he remembered him. Randy replied, "Yeah,"

■ Moreover, despite the *Green* strategy, there was evidence "worthy of consideration" that defendant did not intend to kill in the testimony of two of the prosecution's key witnesses. Donna Silbertson stated that defendant told her, *immediately after the killing,* that "he didn't mean to pull the trigger," but "the trigger was really light." Henry Grant also testified that defendant told him, on the night of the killing, that "the gun went off."

In *People v. Ramos, supra,* 37 Cal.3d 136, the defendant testified at the penalty phase that while he intended to shoot the victims, he meant only to graze them, not to kill them. The defendant in *People v. Anderson* (1985) 38 Cal.3d 58 [210 Cal.Rptr. 777, 694 P.2d 1149], told police that he fired without intent to shoot anyone when confronted by the occupant of the house he was burglarizing. Observing that these statements were not inherently incredible, we held the *Cantrell-Thornton* exception inapplicable in both instances.

Certainly the evidence indicating a lack of intent to kill in this case—evidence offered by the prosecution witnesses themselves—is at least as substantial as that in *Anderson* and far more persuasive than that in *Ramos.* And, as noted, defense counsel had no reason to emphasize the possible lack of intent or introduce further evidence to negate intent. For these reasons—and bearing in mind the caveat of *Garcia* that the *Cantrell-Thornton* reasoning would apply "only to those cases clearly falling within the ambit of that reasoning so as not to detract substantially from the per se character of the high court's rule" (36 Cal.3d at p. 557)—we conclude that the *Cantrell-Thornton* exception is inapplicable and that *Carlos* error requires reversal of the special circumstance finding.

### IV. *Conclusion*

The judgment is reversed insofar as it relates to the special circumstance finding and penalty. On the issue of guilt, the judgment is affirmed.

Bird, C. J., Broussard, J., and Reynoso, J., concurred.

**MOSK, J.**—I concur in affirming the judgment as to guilt, but dissent from reversal of the special circumstance finding.

---

and defendant said, "Well, we are going to go for a ride." Randy started to step out of the car and defendant told him to put his foot back in. At the same time, defendant tightened up on the grip of the pistol and it went off. He had not intended to kill Randy there; he wanted to take him somewhere else and beat him up. He thought at first that the bullet had missed, but then Randy "dropped." At the time of the shooting, defendant was about three feet from Randy and was holding the gun in his lap.

I

The majority go astray at the outset of their analysis by assuming that "The only possible exception" to the *Carlos* rule of reversal "which might possibly apply" is the so-called *Cantrell-Thornton* exception. (*Ante,* p. 306.) This mistaken premise leads the majority into the tangled thicket of factual questions that must be answered in every *Cantrell-Thornton* inquiry, e.g., whether defendant presented all the evidence at his command to negate intent to kill, and whether his evidence was "worthy of consideration." Yet as the majority concede, in this case the intent issue is raised "in a perverse fashion" (*ante,* p. 306). In all our previous *Carlos-Garcia* cases—including the pair cited by the majority (*People* v. *Anderson* (1985) 38 Cal.3d 58 [210 Cal.Rptr. 777, 694 P.2d 1149], and *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430])—the defendant presented at least some evidence to support his claim that he did not have an intent to kill; here, by contrast, defendant presented no exculpatory evidence and strenuously argued the exact opposite, i.e., that he did intend to kill his victim. In these circumstances it is not surprising that the majority have much difficulty and little success in applying a *Cantrell-Thornton* analysis to the facts at hand.

The effort is unnecessary, moreover, because the case fits easily into a different exception to the *Carlos* rule. I refer of course to the exception that the United States Supreme Court recognized in *Connecticut* v. *Johnson* (1983) 460 U.S. 73, 87 [74 L.Ed.2d 823, 834, 103 S.Ct. 969] (plur. opn.)— and we reiterated in *People* v. *Garcia* (1984) 36 Cal.3d 539, 554 [205 Cal.Rptr. 265, 684 P.2d 826]—for cases in which the defendant conceded the issue of intent. The majority acknowledge but brush aside this exception with the remark, "Obviously, however, the court was not addressing a situation where the 'concession' is triggered by an erroneous perception that it costs nothing and may, indeed, be to the defendant's advantage." (*Ante,* p. 306, fn. 12.) With respect, the remark misses the point. It is true that in pre-*Carlos* cases the defendant's perception of a concession of intent may have been "erroneous" in the narrow sense that he did not actually know he could defend against a charge of felony-murder special circumstance by contesting the intent issue. But it was not erroneous in a larger, objective sense: since our decision in *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], the question whether such a concession "costs nothing" or—more important—may "be to the defendant's advantage" depends entirely on the state of the evidence. As I shall show, on the record of this case the concession was to defendant's advantage.

I begin by recalling an important point that our recent decisions seemed to have lost from view: in administering the first two exceptions to the *Carlos* rule of reversal recognized in *Garcia,* we are applying federal law,

not state law. We made this plain in *Garcia* when we stressed that "To avoid possible misunderstanding, we reiterate that we decide the present case on the basis of federal precedent" (36 Cal.3d at p. 554, fn. 10), and expressly took no position on what we would do in the absence of such "controlling federal authority" (*ibid.*). That authority, of course, is primarily *Connecticut* v. *Johnson, supra,* where we found the two exceptions in question. It therefore behooves us to reread what that opinion said on the subject. After declaring the general principle that the error "may be harmless if the defendant conceded the issue of intent" (460 U.S. at p. 87 [74 L.Ed.2d at p. 834]), the high court went on to explain with some care: "In presenting a defense such as alibi, insanity, or self-defense, a defendant may in some cases admit that the act alleged by the prosecution was intentional, thereby sufficiently reducing the likelihood that the jury applied the erroneous instruction as to permit the appellate court to consider the error harmless. [Citation.] We leave it to the lower courts to determine whether, by raising a particular defense or by his other actions, a defendant himself has taken the issue of intent away from the jury." (*Ibid.*)

In this passage the Supreme Court makes no new law; it simply recognizes a fact of trial life, i.e., that in certain cases a defendant may find it necessary or expedient to concede one element of the crime in order to make his defense to the charge as a whole. For example, when the prosecution evidence tends to show an intentional killing and the defense is self-defense, the defendant may choose to lend credibility to his claim that "it was either him or me" by expressly conceding that he intentionally killed in order to save his life. In that event, as the Supreme Court reasons, the likelihood that the jury actually applied an erroneous instruction withdrawing the element of intent from the case is so small that an appellate court can hold the error harmless.

Contrary to the majority here, the Supreme Court does *not* condition the validity of the defendant's concession of intent on his knowing the instruction was in fact erroneous. Indeed, to impose that condition would nullify the exception: in all cases tried before the decision declaring the instruction erroneous (here, *Carlos*), defendants could plausibly claim on appeal that they conceded intent solely or even partly because they did not know of the error; if that lack of knowledge were dispositive, the exception would always be inapplicable. Thus the result of the majority's approach in the case at bar is to impute to the Supreme Court—and to this court in *Garcia*—an intent to erect an exception that would never be applied.

This anomaly may be avoided by simply taking the Supreme Court at its word: we should review the record "to determine whether, by raising a particular defense or by his other actions, [the] defendant himself has taken

the issue of intent away from the jury." (460 U.S. at p. 87 [74 L.Ed.2d at pp. 834-835].) In this case the task is not difficult.

From the majority's own recital of the facts it is clear the prosecution introduced ample evidence that defendant intended to kill Randy Watkins. Defendant's strong feelings of jealousy towards his wife's lover, and his consequent desire for revenge, supplied the motive. The method was his plan to accost and kill Randy as he was making the night deposit near the store where he worked. It is incredible to believe that defendant and his wife travelled the 226 miles from Reno to Modesto for the purpose of robbing a small convenience store, or that it was purely coincidental defendant's sworn enemy worked at that particular store and was the person who carried its receipts to the bank. If robbery had been defendant's intent, there were hundreds of potential and more affluent victims on the long route from Reno to Modesto. Yet all were overlooked in order to get to this store and this victim.

In addition, numerous eyewitnesses testified to admissions by defendant of his intent to kill Randy. Defendant's wife recounted that before arriving on the scene of the shooting he said, "Tonight is the night I am going to get even with you for what you have done to me." He told her he was going to get into Randy's car, make him drive someplace else, and kill him. Defendant in fact entered Randy's car and shot him in the face at close range. A week later defendant told Danny Haggerman that he had gone to Modesto "to blow someone away"; that he jumped into a parked car, and before the person inside could say anything he pulled the trigger and shot him in the head; and that he would kill anyone if he had a grudge against them. Still later defendant told Beverly Deeter that he had gone to Modesto to kill someone named Randy; that he did so because Randy had raped his wife Donna; that Donna had told him about the rape; and that he killed Randy at the bank and took the money to make it look like a robbery rather than a murder.

On this state of the evidence, defendant's best if not only hope of dissuading the jury from finding true the charged robbery-murder special circumstance—thus exposing him to the death penalty—was to rely on our decision in *People* v. *Green, supra,* 27 Cal.3d 1, 59-62. In *Green* we held (at p. 61) that a robbery-murder special circumstance is impermissible under the statute "when the defendant's intent is not to steal but to kill and the robbery is merely incidental to the murder . . . because its sole object is to facilitate or conceal the primary crime."

As the majority acknowledge, defendant's decision to present a *Green* defense was apparent throughout the trial. In his opening statement his coun-

sel admitted defendant killed Randy and told the jurors their task would be "to decide whether or not this was a killing that occurred during the course of a robbery or, in the alternative, was this a murder in which during the course of that murder, at the end of that murder, a theft was committed." During the taking of evidence counsel refrained from challenging on cross-examination any of the prosecution testimony recounting defendant's admissions of intent to kill. And in his closing argument, as the majority quote at length (*ante,* p. 305), he repeatedly relied on that testimony as proof that defendant's "intent was to kill Randy Watkins." From this premise counsel argued vigorously that although his client was guilty of murder, it was not a murder intended to facilitate or conceal a primary crime of robbery, and hence would not support a finding of robbery-murder special circumstance.

This was an eminently rational defense. Its legal basis was our decision in *Green;* its factual basis was prosecution testimony from which, if it had chosen to do so, the jury could reasonably have inferred that the robbery in this case was merely incidental to the killing and hence would not support the only special circumstance alleged. For good and sufficient reasons, therefore, defendant chose to concede the issue of intent in order to make his most plausible defense on the facts as they unfolded. This is precisely the scenario contemplated by the Supreme Court in *Connecticut* v. *Johnson,* and in the words of that opinion, defendant's express concession of intent "thereby sufficiently reduc[es] the likelihood that the jury applied the erroneous instruction as to permit [this] court to consider the error harmless." (460 U.S. at p. 87 [74 L.Ed.2d at p. 834].) (Accord, *People* v. *Allen* (1985) 165 Cal.App.3d 616, 628-629 [211 Cal.Rptr. 837].)

To invoke this exception when it is plainly warranted will, like the *Cantrell-Thornton* exception, "avoid a meaningless retrial." (*Garcia, supra,* at p. 556 of 36 Cal.3d.) Here retrial would be an aimless exercise: even though defendant now knows of his right to contest the issue of intent to kill, he would still have no reason to do so if a retrial were ordered. This is so because in such a proceeding the jury would be given the now-standard instruction to find the robbery-murder special circumstance allegation to be true only if the murder occurred during the commission of a robbery and both the following are proved: (1) defendant intended to kill (*Carlos*) and (2) the murder was committed for the purpose of facilitating or concealing the robbery (*Green*). (CALJIC No. 8.81.17 (1984 rev.).) Defendant could contest either of the latter elements of the People's case, but he could not plausibly contest both: he could not plausibly tell the jury that he did not intend to kill at all *and* that he killed for the purpose of (i.e., with the intent of) facilitating or concealing the robbery. Under a correct statement of the law, therefore, defendant would still have to choose between a *Carlos* de-

fense and a *Green* defense; nothing we say or do here can relieve him from having to make that tactical decision. And because the prosecution would put on the same evidence of his intent to kill, defendant's best chance of success would still be the *Green* defense. It is sheer fantasy to speculate that he might abandon that defense in favor of a desperate assault on the credibility of each of the numerous prosecution witnesses who testified to his admissions of intent to kill, supported by strong circumstantial evidence.

## II

The majority also err by considering on this *guilt* issue defendant's testimony at the *penalty* phase. (*Ante,* pp. 306-307, fn. 13.) For the right to do so they rely exclusively on *People* v. *Ramos, supra,* 37 Cal.3d at page 148. But the opinion in *Ramos* gives neither statutory nor case authority, nor reasoned analysis, to justify this step: it merely refers to Ramos's penalty phase testimony in its *Garcia* analysis without explaining why it was proper to do so. The issue was simply not addressed in the opinion, and it is settled that "Cases are not authority for propositions not considered." (*In re Tartar* (1959) 52 Cal.2d 250, 258 [339 P.2d 553], and cases cited.)

Before the nonauthority of *Ramos* on this point is elevated into a precedent by an unthinking repetition of the procedure in this case, we should stop and inquire whether we are making good law.[1] I know of no other serious instructional error in the *guilt* phase of a capital trial that can be cured by relying on testimony given later at the *penalty* phase. And the reason is plain: when an appellate court holds such an error harmless, it is expressing its opinion that even if the correct instruction had been given it is reasonably probable (or probable beyond a reasonable doubt, etc.) that the jury would have reached the same verdict *because of the other evidence and instructions before the jury*—or more precisely, that a rational trier of fact would have reached the same verdict *if it had known what this jury knew.* But in its deliberations in the guilt phase of a capital trial no jury knows what evidence or instructions will be given in the penalty phase, if it in fact reaches that phase. Indeed, much of the latter evidence would be highly prejudicial to the defendant at the guilt phase; it is therefore inadmissible at that phase, and the whole apparatus of trying a capital case in separate stages is designed precisely to *prevent* the jury from considering such evidence on the issue of guilt. Yet even though the jury would not have heard this evidence in the guilt phase, the majority nevertheless consider it in determining what

---

[1] I address the point not so much for this case as for future automatic appeals that raise the *Carlos-Garcia* error, a number of which are pending before us; the point relates particularly to the *Cantrell-Thornton* analysis, a frequent issue in such appeals. As explained in Part I, however, we need not reach that analysis in this case.

the jury would have done if it *could* have heard it. This is not reasoning, but guesswork.

Not only is the procedure inconsistent with the whole theory of the harmless error rule, it is unfair to defendants facing the supreme penalty. In the guilt phase of their trials such defendants have the constitutional right to stand mute and require the state to prove its case without their help. By contrast, if they are found guilty of a potentially capital crime, it is often their best hope in the penalty phase to admit the offense and express their remorse; any lack of that emotion will usually be exploited to the full by the prosecutor. Under the majority's new rule, however, defendants who exercised their right not to testify in the guilt phase might be reluctant to admit that intent in the penalty phase and express remorse, for fear that the admission will be used against them by this court if we find the intent instruction erroneous. The same chilling effect would be felt by those who, in the exercise of their right to put on the defense of their choice, chose to deny intent to kill in the guilt phase. We would never think of using this procedure for other errors: for example, we would never hold that an error in a guilt-phase alibi instruction can be cured by the defendant's admission in the penalty phase that in fact he was at the scene of the crime, or that an error in a guilt-phase self-defense instruction can be cured by his admission in the penalty phase that he did initiate the combat. How then can we justify a different rule when the error is in the crucial instruction on intent?

For the reasons stated in Part I, I would uphold the special circumstance finding in this case.

GRODIN, J., Concurring.—I find it unnecessary in this case to decide whether the *Garcia/Connecticut* v. *Johnson* "concession" exception is conditioned on the defendant's having known the "intent instruction" was in fact erroneous. Even assuming (as the dissent contends) it is not so conditioned, in my view there was no such concession here. Contrary to the situation in *Krzeminski* v. *Perini* (6th Cir. 1980) 614 F.2d 121, 125, and *Washington* v. *Harris* (2d Cir. 1981) 650 F.2d 447, 453-454 (on which the *Connecticut* v. *Johnson* court relied in illustrating the intent conceded exception, 460 U.S. 73, 87 [74 L.Ed.2d 823, 103 S.Ct. 969]), defense counsel's argument that his client intended to kill was *inconsistent with defendant's own version of the killing* as shown by penalty phase testimony. Taking the lead from *Krzeminski* and *Washington,* I would apply the "concession exception" only if the concession is consistent with the defendant's version of the crime. Subject to the foregoing reservation, I concur in the majority opinion.

LUCAS, J.—I concur in the judgment to the extent it affirms defendant's guilt conviction. I dissent, however, to the setting aside of the special cir-

cumstances finding and penalty judgment. For the reasons stated in part I of Justice Mosk's concurring and dissenting opinion, defendant's concession of an intent to kill satisfies the *Carlos/Garcia* rule.