[No. F005359. Fifth Dist. Jan. 29, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT PORTER SMITH, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of parts I, II and VI through IX.

COUNSEL

Michael G. Idiart, Bennett & Sharpe and Katherine Hart for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Michael A. Garcia and Alison Aleman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BALLANTYNE, J.—

## INTRODUCTION

An information filed in the Fresno County Superior Court charged appellant with two counts of murder (violation of Pen. Code, § 187, a felony). The information further alleged appellant's use of a deadly and dangerous weapon during the commission or intended commission of the offense.

Special circumstances were charged on both counts for multiple murder under Penal Code section 190.2, subdivision (a)(3). Count I included a further special circumstance for intentionally killing a victim while lying in wait within the meaning of Penal Code section 190.2, subdivision (a)(15).

After trial commenced the People made an oral motion to amend the information to add the special circumstance of lying in wait to count II, but the trial court never made a ruling on the issue.

The jury returned verdicts finding appellant guilty of the murders, in the first degree, of DeAnn Skaggs and her unborn child, and found to be true

the allegation of appellant's personal use of a dangerous and deadly weapon and the special circumstances alleged in the information. In addition, the jury specifically found true, with respect to count II of the information, the special circumstance that appellant had intentionally killed the victim while lying in wait, within the meaning of Penal Code section 190.2, subdivision (a)(15).

The trial court denied appellant's motions for a new trial, to modify the verdict, and to strike the special circumstance of lying in wait.

Appellant was sentenced to state prison for the term of life without possibility of parole.

## THE FACTS

Appellant, a student at the University of California, Davis, resided during the summers with his grandmother in Fresno. Appellant was well acquainted with the victim, DeAnn Skaggs (Annie), and her husband, Gary Skaggs (Skaggs), appellant's lifelong friend. During the evening of August 3, 1983, at approximately 12 midnight, Skaggs returned to his apartment in Fresno and discovered Annie, who was approximately six to seven months pregnant, lying dead on the bedroom floor.

Annie was lying nude on her back in the bedroom, surrounded by numerous pools of blood and covered with multiple wounds, apparently inflicted by a sharp instrument, primarily to her neck and throat.

Physical evidence recovered from the scene included strands of loose hair from a lampshade and table, from the victim's hands and body, and from a pair of male underwear located in the bedroom. On the floor near the victim were some loose cigarettes and a book of matches, and a package of cigarettes was discovered under the bed a few inches from the edge. Footprints were observed in a dirt area adjacent to the apartment and approximately 10 feet south of the apartment's front door. A woodpile was near the apartment. The east wall of the bedroom was heavily covered with blood and blood was discovered on the bedroom closet door, on the floor inside the closet, and on the bedding. Impressions or indentations created by some unknown type of instrument were found on the locking mechanism of the sliding glass door to the Skaggs apartment, but the sliding glass door was secure.

During the evening of August 3, 1983, Skaggs patronized the Black Angus Restaurant in Fresno with coworkers from 8:30 p.m. until 11:30 p.m. when he departed for home. Skaggs had stopped at appellant's home earlier that

evening to visit with appellant for approximately five minutes prior to arriving at the Black Angus. During the evening, Annie had visited the home of her mother-in-law, Irene Skaggs (Irene), arriving between 7 p.m. and 7:30 p.m. and staying approximately three hours. When Annie left her mother-in-law's home, she indicated that she wanted to be home by 11 p.m. when she expected Skaggs to arrive home.

Steven Humphrey (Humphrey) testified that he and a coworker left work at approximately 10 p.m. on the evening in question and went to visit a friend who lived near the Skaggs apartment. Humphrey testified they observed an individual near the apartment dressed in a Pendleton-style shirt, brown cords, a bandana and a derby-style black hat. Humphrey described him as a Mexican male to investigating officers.

Dr. Jerry Nelson, a pathologist, conducted an autopsy at approximately 9:30 a.m. on August 4. According to Dr. Nelson, Annie, a pregnant 21-year-old female, had sustained 53 sharply incised linear wounds to her body, most of which were skin deep. However, many of the wounds had passed into the subcutaneous tissue and 12 were concentrated around the victim's neck area with several others concentrated in the upper left chest area. Dr. Nelson testified that the wounds were consistent with hatchet wounds, although this possibility did not occur to him during the autopsy. The victim had also sustained bruises to her face and left collarbone, a laceration over her lip, a fracture of the left jawbone, and small hemorrhages on the inner eyelids and voice box, indicating the possibility of manual strangulation. The cause of death was a massive hemorrhage resulting in shock. Dr. Nelson, relying on the victim's liver temperature obtained at 2 a.m., roughly estimated the time of death to be midnight, but expressed discomfort with this estimate and stated that if the victim was fighting for her life for 20 minutes, his estimate could be extended one to two hours.

The fetus was removed from Annie's uterus and observed to be a male infant, approximately 37 centimeters long and weighing approximatey 1200 grams. Dr. Nelson estimated the gestation of the fetus to be approximately six to seven calendar months. The fetus demonstrated no signs of trauma or congenital abnormality and its body organs and systems were well developed. Dr. Nelson observed small hemorrhages in the fetal heart and the blood vessels of the fetal brain. Dr. Nelson fixed the cause of death of the fetus as deprivation of oxygen due to maternal hemorrhage and shock. Dr. Nelson opined that there was no evidence to suggest that the fetus would not have survived if the pregnancy had been permitted to continue to term.

Dr. Krisnakumar Rajani, a physician and neonatologist, opined that the gestation of the fetus at the time of death was approximately 28 to 30 weeks.

Dr. Rajani testified that an unborn fetus of the size and development in question has an 85 percent survival rate or chance of being viable.

Torie Fields (Fields) met and began to date appellant in late March 1983, just prior to Skaggs's marriage to Annie. Fields met Skaggs shortly thereafter and during this first meeting with Skaggs, while in appellant's company, appellant referred to Annie as a "bitch." In the first part of May 1983, in response to appellant's comment that he believed Annie did not like him, Fields asked appellant why he believed she felt that way, and appellant replied that at one time he and Skaggs had a "type of, umm, homosexual relationship" and that was why. On the weekend of July 30 and 31, 1983, appellant and Fields were together on a trip to Disneyland. Appellant stated that the Skaggses were very unhappily married and that appellant did not like Annie Skaggs. He told Fields that Annie had gotten pregnant on purpose in order to have Skaggs marry her and Skaggs was very unhappy. The next morning while driving back to Fresno on Monday, August 1, 1983, appellant blurted out how much he hated Annie Skaggs. He looked Fields directly in the eye and stated that all of Gary Skaggs's problems would be solved if Annie were to die and that she deserved to die for making Skaggs so unhappy. Appellant then gazed out the window of the vehicle and began to muse, "talking very, very rapidly, as if he was talking actually to himself" about how "it would be very easy to kill somebody but he'd need someone to help him. You could help me. You'd need somebody to help you hold them down, or you could use a rope and tie them up. You could strangle or stab them." He then added, "This could be fun" and giggled in an eerie fashion. Fields became scared and told him to stop. A few minutes later, appellant asked her, "If anything were to happen to Annie, you'd never think I had anything to do with it?" She replied, "No."

Fields was with appellant on Tuesday, August 2, 1983, and asked whether she could accompany appellant and Skaggs during their intended visit to the Black Angus Restaurant the next evening. Appellant refused, saying Fields could accompany them the next time. Appellant and Fields then went to a thrift store where appellant examined baggy pants and a coat but spent most of his time examining shoes and did not purchase anything.

Appellant attended a rock concert on the evening of Thursday, August 4, 1983, during which he met and conversed with three girls. One of the three questioned appellant about a scratch on his right cheek and he indicated that a cat had scratched him. Appellant, who had been drinking and appeared to be upset, visited the home of one of the girls later that evening and indicated that his friend's wife had recently died and he was attempting to forget it. On August 5, 1983, appellant received a phone call from Fields who called to inquire about the concert. Appellant, who sounded agitated and upset,

indicated to her that something terrible had happened and that Annie was dead. Fields did not believe appellant and told him to hang up. Fields subsequently learned from another source that Annie had indeed been killed and phoned appellant to apologize for not believing him. Appellant stated to Fields that he had gone out that evening (Aug. 3, 1983) with Skaggs and that he and Skaggs had discovered Annie dead in the apartment. Appellant later admitted to her that he had lied to her about having been with Skaggs that evening out of concern that she might be afraid of him.

Robert Marshall (Marshall), an assistant assignment editor at KXTV, Channel 10 in Sacramento, testified that he and appellant were friends, fraternity brothers, and former schoolmates at the University of California, Davis. Marshall indicated that appellant had informed him that the authorities had talked to appellant regarding the murder of appellant's best friend's pregnant wife.

On January 22, 1984, appellant and Marshall were driving together after having had a few drinks when Marshall inquired of appellant how things were going in the murder investigation. Appellant responded, "I did it." When Marshall asked why, appellant told him that Skaggs desired to go into the musical ministry but was held back by his wife and expected child; that he and Skaggs had concluded that it was the will of God that Skaggs should continue his efforts to enter the musical ministry; that Skaggs had to marry Annie because she was pregnant, and that it was acceptable to kill Annie because it was God's will that Skaggs should continue in his ministerial endeavors.

Appellant further stated he was given a key to the Skaggs apartment by Skaggs on the night in question, because that was Skaggs's regular night out. Appellant explained to Marshall that he wore gloves and disguised himself as a Chicano or "cholo" after obtaining the appropriate attire from thrift stores. Appellant waited outside the Skaggs apartment near a woodpile, and then, after he believed the victim was asleep, used the key to enter the apartment. Appellant told Marshall that he entered the apartment bedroom and struck Annie in the neck with a hatchet. Appellant divulged that he used a hatchet in the belief that it would be quick and painless. However, Annie began to struggle with appellant after he struck her and even managed to take the hatchet away from him at one point during the struggle, which lasted for approximately 20 minutes before Annie died.

Appellant further informed Marshall he had worn shoes that were a half size too small, in order to confuse the authorities, and gloves and a hat. Marshall told appellant he was uncertain whether appellant would kill again and advised appellant to obtain assistance or counselling.

Upset at what he had just learned, Marshall began to discuss the story with his girlfriend, two coworkers and a priest. Rick Kavooras, executive producer at Channel 10, advised an apparently distraught Marshall to notify the authorities.

Marshall notified the authorities that he was meeting with appellant. A police unit was dispatched to keep them under surveillance. Appellant explained to Marshall he had purchased a hatchet at Zody's Department Store. Appellant described how he had tracked around in the dirt outside the apartment in order to leave footprints that were smaller than his normal shoe size. Appellant stated that he and Skaggs were very close friends and lived outside the normal societal rules.

Appellant's detailed narrative included a description of the location of the crime, including the fact there was a fence behind the apartment with a field behind the fence, and the fact that appellant had entered through the apartment's front door. Appellant told Marshall that he waited outside for approximately two hours until the lights in the apartment were turned off and he was certain Annie had fallen asleep. Appellant stated that when he entered the bedroom Annie was lying in bed nude, and as appellant opened the door Annie started to sit upright and said, "Gary." During the struggle Annie scratched appellant on the face and he continued to struggle with her when she began to fight back because he believed he had already killed the fetus and could not risk her living to identify him. Following Annie's death, appellant left the apartment leaving behind a pack of cigarettes to confuse investigators. He then drove his grandmother's car to Madera and threw the hatchet and clothing he had been wearing in a canal.

Appellant expressed concern that he had made statements to his girlfriend that he, Marshall, and Marshall's girlfriend had had sexual relations together. Appellant then told Marshall that he and Skaggs had "had sex together and he also said that sometime like 10 years before he'd kind of flirted with Gary but Gary had turned him off." Appellant also told Marshall that he believed that once Annie was gone "everything would be the same as it had always been and they [appellant and Skaggs] could go back to being best friends."

After delivering appellant to the fraternity house in Davis, Marshall drove away and then pulled off the road to talk to a detective who had been following Marshall and appellant. Marshall, upset and agitated, stated that he had "just spent the last couple of hours listening to one of [his] best friends tell [him] how he killed that lady."

When appellant was subsequently arrested, Marshall was present at appellant's fraternity house in Davis with a television news crew for the purpose

of covering the arrest. Marshall telephoned his television station and spoke with Kavooras. Marshall testified he was concerned about how details of his personal life would be brought out during a trial. Marshall admitted his use of drugs in the past, including the week prior to testifying. Marshall also admitted having homosexual experiences. Marshall confirmed that he, his girlfriend, and appellant had a sexual encounter in May 1983, during which Marshall had orally copulated appellant.

Criminalists testified that a pair of black, cloth-weave shoes, manufactured by Kinsman, size 10, and purchased at the K-Mart discount store adjacent to the apartment complex in which the Skaggses lived, had the same class characteristics and impression size as prints observed at the scene of the crime. Analysis of hair obtained from appellant's head indicated the hair was type 2-1 in the PGM blood system, a type comprising some 35 to 36 percent of the population. A loose hair recovered from the victim's pubic area also was analyzed and found to belong to the PGM type 2-1 class. Two foreign hairs recovered from Annie's pubic hair and one of four loose hairs recovered from the victim's right hand had physical characteristics consistent with appellant's hair while none of four loose hairs recovered from the region of the victim's neck possessed physical characteristics consistent with appellant's hair.

Appellant testified in his own behalf during trial and denied killing Annie or striking her with a hatchet. Appellant denied that he went to the Skaggs home on the night of the murder and insisted he never confessed to the murder to Marshall. Appellant admitted owning a black derby hat and acknowledged that he might have sustained scratches from a cat during the time frame in which the murder occurred. Appellant stated that many of the details of the murder, which Skaggs had told him, were later told to Marshall.

Appellant admitted that he had lied to Fields about being with Skaggs on the night of the murder because he did not want Fields to think that he was involved in the murder.

Skaggs testified that he had talked with appellant shortly after Annie's funeral and discussed the case extensively.

DISCUSSION

I.-II.*

. . . . . . . . . . . . . . . . . . . .

*See footnote on page 1495, *ante*.

## III.

### Carlos Error.

Appellant contends that the trial court committed *Carlos*[6] error in failing to instruct the jury that in order to find true the special circumstance allegation that appellant committed a multiple murder, within the meaning of Penal Code section 190.2, subdivision (a)(3), it must determine that each killing was intentional. Furthermore, appellant's reply brief appears to argue additional error by the trial court by alleged failure to satisfy its sua sponte duty to instruct the jury on each of the essential elements of the offense actually charged. Appellant believes the trial court failed to instruct the jury under the theory of a second degree implied-malice murder where there was evidence to support such an instruction.

Defense counsel, however, stipulated that the killings were first degree murder. Respondent contends that the holding in *Carlos* is not applicable to the instant case, and that in any event no *Carlos* error occurred, and even if *Carlos* error did in fact occur, the error was harmless.

Pursuant to CALJIC No. 8.81.3, the jury in the instant case was instructed on the special circumstance of multiple murder convictions as follows: "To find the special circumstance referred to in these instructions as multiple murder convictions is true, it must be proved that the defendant has in this case been convicted of more than one offense of murder in the first degree." With respect to the special circumstance of multiple murder, the jury made the following finding in its verdict: "[With respect to count one] we further find to be true that the murder of Deann Skaggs was committed by the defendant and, in addition to such murder, said defendant is now being charged with having murdered and has murdered a human fetus, on and about the same date, within the meaning of Penal Code section 190.2 (a)(3).

"[With respect to count two] we further find to be true that the murder of the human fetus was committed by the defendant and, in addition to such murder, said defendant is now being charged with having murdered and has murdered Deann Skaggs, a human being, on and about the same date, within the meaning of Penal Code section 190.2 (a)(3)."

In *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, the Supreme Court concluded that the felony-murder special circumstance (Pen. Code, § 190.2 subd. (a)(17)) should be construed to require an intent to kill or to aid in a killing. In *People* v. *Garcia* (1984) 36 Cal.3d 539, at pages 547-549 [205

---

[6]*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].

Cal.Rptr. 265, 684 P.2d 826], the Supreme Court further concluded that the holding in *Carlos* is retroactive and is therefore applicable in the instant case if *Carlos* error occurred.

In *Carlos,* the Supreme Court construed the term intentionally, as used in Penal Code section 190.2, subdivision (b), "to apply to all defendants—actual killers and accomplices alike—and to require an intent to kill before a defendant is subject to a special circumstance finding under paragraph 17 of that section." (35 Cal.3d at pp. 153-154.) In *People* v. *Turner* (1984) 37 Cal.3d 302, at page 329 [208 Cal.Rptr. 196, 690 P.2d 669], the Supreme Court concluded that the same provision is not "limited to the felony-murder special circumstance . . . at issue in *Carlos.* By its terms, the subdivision has equal application to subdivision (a), paragraph (3), the multiple murder special circumstance at issue here. [Fn. omitted.]"[7]

Respondent argues first that no *Carlos* error occurred in the instant case, and second that even if *Carlos* error occurred, the error was harmless.

The essence of respondent's argument that no *Carlos* error occurred is premised upon a conceptual framework linking the contested special circumstance instruction on multiple murder with other proper instructions. The jury was told that the "crime of murder in the first degree requires the specific intent to kill." The multiple-murder special-circumstance instruction given to the jury specifically informed the jury that "it must be proved that the defendant has in this case been convicted of more than one offense of *murder in the first degree.*" (Italics added.) With respect to the theory of first degree murder upon which appellant was convicted—"any kind of willful, deliberate and premeditated killing with . . . express malice aforethought"—the jury was instructed that the term willful, as used in the instruction, means intentional. Finally, the jury was directed to "consider all the instructions as a whole" and to "regard each in the light of all the others."

## A. *California Exceptions.*

 Although it is true that the multiple-murder special-circumstance instruction was technically deficient in its failure to fully instruct the jury on the issue of intent, by requiring the jury to find two first degree murders,

---

[7]Respondent argues preliminarily that the *Carlos* holding is not applicable to the instant case because it, and the decisions which followed it, involved cases invalidating special circumstances where the defendant's murder conviction was based upon the felony-murder theory. Noting that appellant in the instant case was convicted of first degree murder based on willful, deliberate and premeditated murder, respondent contends *Carlos* need not be applied. Respondent's analysis regarding the theory under which appellant was convicted of first degree murder is more appropriate to a discussion of the test of prejudicial error set forth in *People* v. *Garcia, supra,* 36 Cal.3d 539 .

the special circumstance instruction incorporated the first degree intentional-murder instruction utilized in the instant case. The special circumstance instruction is required to be read with all other instructions and specifically incorporates the first degree murder instruction. It cannot be said that the instructions "completely eliminated the issue of intent to kill from the consideration of the jury." (*People* v. *Garcia, supra,* 36 Cal.3d at p. 554.)

It is also clear that the *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913] exception recognized in *Garcia* is applicable in the instant matter. In *People* v. *Montiel* (1985) 39 Cal.3d 910 [218 Cal.Rptr. 572, 705 P.2d 1248], the defendant was convicted of murder and robbery of the murder victim, and the jury found true the special circumstances that the murder was intentional and for financial gain and occurred during the commission of a robbery. The defendant challenged the failure of the trial court to instruct the jury that it must also find that the defendant intended to kill his victim before it could find the felony-murder special circumstance to be true.

The Supreme Court rejected this argument applying the *Sedeno* exception. The trial court's instruction on the financial-gain special circumstance required the jury to find "that 'the murder was intentional and carried out for financial gain.' " The Supreme Court concluded this instruction directed the jury to determine "whether the defendant intentionally sought the victim's *death*; no other possible distinction can be drawn between intentional and unintentional murders in this context. [Fn. omitted.]" (39 Cal.3d at pp. 926-927.)

On this basis, the Supreme Court in *Montiel* concluded that the *Sedeno* exception was applicable. The *Montiel* court concluded that the trial court had erred in instructing the jury on the financial-gain special circumstance. (39 Cal.3d at p. 927.) The court went on to note, however, that its holding did not detract from its earlier discussion whereby it relied upon this provision in applying *Carlos-Garcia*. The jury in the instant case was instructed that in order to find true the special circumstance of murder while lying in wait, it must find "that the defendant intentionally killed the victim . . . ." We hold that here the situation is similar to that which confronted the Supreme Court in *Montiel* and compelled it to find applicable the third *Carlos-Garcia* exception.

Respondent also argues that the so-called *Cantrell-Thornton* exception recognized in *Garcia* is applicable. This exception exists where all the evidence on an issue is presented by both sides and the record establishes the necessary intent as a matter of law because evidence to the contrary is unworthy of consideration. (*People* v. *Garcia, supra,* 36 Cal.3d at p. 556;

*People* v. *Cantrell* (1973) 8 Cal.3d 672, 685 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267].)

The evidence establishes intent to kill as a matter of law, noting that the victim had sustained 53 hatchet wounds, including many about the neck and throat area, as well as a fractured jaw and evidence of strangulation. It is clear that the prosecution's evidence pertaining to the perpetrator's intent to kill was unrefuted. The defense theory relied solely on proof that appellant was not the perpetrator. Indeed, during the instruction conference, trial counsel for appellant expressly waived the issue of intent and further instruction on specific intent to kill: "THE COURT: All right. Further, it occurred to me while reading the instructions that when reading 8.10, 'Murder—Defined,' 'Murder is defined as the killing of a human being or fetus, that the human being or fetus was killed, that the killing was unlawful, and the killing was done with malice aforethought.'

"It seems to me that could be viewed as inconsistent instruction with the other instructions in that this jury—that is the definition of murder, but since this jury is only being submitted murder in the first degree, I think that could be viewed as inconsistent, and either I'll—unless Counsel agrees that in view of all the other instructions that were given that were specific that this had to be a specific intent to kill, umm, I propose to specifically advise the jury and read that instruction again and add the specific intent to kill.

"MR. FREED [the prosecutor]: As opposed to malice aforethought? Or in addition to?

"THE COURT: In addition to it.

"MR. FREED: I don't care.

"MR. BROWN [defense counsel]: Well, Your Honor, there's been so many other instructions, that's insignificant in this case. I mean, we've talked about this case. Either he did it or didn't, and what—there is no—I have no thoughts on the matter, Your Honor. I would just ask—I don't think the Court should instruct them again, and if it requires me waiving it, I have no problem waiving it.

"THE COURT: Do you waive it then?

"MR. BROWN: Yes, sir, I do.

"THE COURT: Do you agree that in view of the argument, the issues that have been submitted, and the total instructions that have been submitted,

that the jury has been properly instructed that they must find as an element of this crime specific intent and that's really not an issue in this case anyway?

"MR. BROWN: That's correct, Your Honor.

"MR. FREED: Yes, Your Honor."

A majority of the *Montiel* court also followed Justice Kaus's concurring opinion cautioning that in some instances defendants could have a pre-*Carlos* impression that the People would not have to prove intent to kill as an element of a felony-murder special circumstance. The defendant may then decide to forgo any attempt at raising reasonable doubt on intent to kill attempting to totally avoid the felony-murder charge. It is, therefore, inappropriate to apply *Sedeno* where a defendant does not present relevant evidence on intent because of a mistaken application of the law.

The preceding colloquy demonstrates that the trial court and both counsel were aware of the intent issue. The instant trial followed the *Carlos* decision by a year and one-half. Aware of the issue of intent, the trial court obtained a full and express waiver from both counsel that specific intent was not an issue in the case.

The defendant's theory was that he never committed the crime. It was an all-or-nothing strategy. There was no alternative defense that the defendant was incapable of forming specific intent or that he was not mentally sound. The defendant portrayed himself as a typical, clean-cut college student preparing to become an attorney. As Mr. Brown stated to the court, "Either he did it or didn't." This defendant did not have a pre-*Carlos* impression that the People would not have to prove intent to kill as an element of a felony-murder special circumstance. The fact that this defendant opted to totally avoid the felony-murder charge does not make this action inappropriate to apply *Sedeno,* because the record as cited above establishes that there was no mistaken understanding of the law surrounding *Carlos* error by the court or by counsel.

In addition to the sheer number of wounds, the fact that the cause of death was a sharply incised wound to the left common carotid artery supports a reasonable inference that significant force was used in the attack on the victim inasmuch as the evidence indicated that the murder weapon was a hatchet, a relatively blunt instrument compared to a knife.

Noting that the Supreme Court's decision in *Turner* had not yet been decided, appellant contends trial counsel had no reason to know that intent to kill would have been an issue with respect to the special circumstance of

multiple murder. Appellant relies on *People* v. *Silbertson* (1985) 41 Cal.3d 296 [221 Cal.Rptr. 152, 709 P.2d 1321], in which the defendant was convicted of first degree murder and robbery and a felony-murder special circumstance was found to be true.

Defense counsel in *Silbertson,* unaware that intent to kill was an element of the special circumstance allegation, adopted the strategy of attempting to establish that his client's intention was to commit an intentional murder with the robbery being merely incidental to the murder. The Supreme Court rejected the *Cantrell-Thornton* exception concluding that defense counsel, unaware that intent to kill was an element of the felony-murder special circumstance, "may indeed have failed to present all credible evidence which might negate the element of intent . . . . [Fn. omitted.]" (41 Cal.3d at p. 306.) The Supreme Court noted that there was evidence worthy of consideration that defendant did not intend to kill. (41 Cal.3d at p. 306, fn. 13.) Relying further on *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430] and *People* v. *Hamilton* (1985) 41 Cal.3d 408 [221 Cal.Rptr. 902, 710 P.2d 981], appellant argues that intent to kill may not be established as a matter of law in the instant case merely because of evidence of the number and placement and type of wounds sustained by the victim.

Appellant's attempt to avoid invocation of the *Cantrell-Thornton* exception fails for two reasons. First, there is absolutely nothing in the record before us, unlike *Silbertson,* to suggest that appellant might have had any evidence worthy of consideration on the issue of intent to kill. Although appellant implies that defense counsel might have argued that the killings "were the product of a wanton and wilful disregard of a known appreciable risk to human life (second degree murder under an "implied malice" theory not requiring a specific intent to kill) or the product of a sudden, uncontrollable, furious rage in which the perpetrator intended to commit bodily harm but not to kill," there is absolutely nothing in the record to support such an argument.

Moreover, the fact that the *Hamilton* decision concluded that stabbing and dismembering the victim did not establish intent to kill as a matter of law does not preclude this court from finding that the number and manner of the wounds sustained by the victim, under the circumstances of the instant case, do in fact establish intent to kill as a matter of law. We note that, unlike the instant case, the cause of death of the victim in *Hamilton* was *not established.* The Supreme Court relied upon this fact to conclude that the "victim might have been killed accidentally, with defendant deciding afterwards to mutilate the body in an attempt to prevent identification. [Fn. omitted.]" (41 Cal.3d at p. 432.)

Furthermore, the very purpose of the murder according to Smith's confession to Marshall was to free Skaggs of the encumbrance of a wife *and* a child so that Skaggs could pursue a ministerial career. Smith was Skaggs's best friend. Smith knew Annie Skaggs and knew that she was pregnant. In his confession Smith expressed contempt for the fact that Skaggs had to marry Annie because she was pregnant. The very motivation for the murder was the pregnancy itself. This was not a murder of an expectant mother the murderer did not know and could not recognize as pregnant. If the jury convicted Smith of first degree murder of both Annie and of baby Skaggs, as it did, Smith necessarily had the intent to kill both mother and child.

B. *Federal standard of review.*

*People* v. *Croy* (1985) 41 Cal.3d 1, 12-16 [221 Cal.Rptr. 592, 710 P.2d 392], and *People* v. *Garcia* (1984) 36 Cal.3d 539, 554-556 [205 Cal.Rptr. 265, 684 P.2d 826], both hold that the failure to instruct on criminal intent as an element of a crime is prejudicial and reversible per se. *Garcia* is based upon the California Supreme Court's interpretation of federal law under *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969]. (36 Cal.3d at p. 554, fn. 10.) *Croy* is also founded "squarely upon principles enunciated by the United States Supreme Court in *Connecticut* v. *Johnson* . . . ." (41 Cal.3d at p. 13.) The exceptions to automatic reversal have been applied very sparingly. The United States Supreme Court recently refused to apply an automatic reversal standard of review to the failure to properly instruct a jury on the intent element in a homicide case. *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101] applied the standard of review announced in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]: "In *Chapman* v. *California,* 386 U.S. 18, . . ., this Court rejected the argument that errors of constitutional dimension necessarily require reversal of criminal convictions. And since *Chapman,* 'we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (478 U.S. at p. __ [92 L.Ed.2d at p. 469, 106 S.Ct. at p. 3105].)

■ *Rose* v. *Clark* reasons that the very purpose of a trial is to determine the factual question of guilt or innocence. Where a trial is tainted with constitutional error that undermines the trial as a vehicle for determining guilt or innocence, then a reviewing court need not consider particular evidence. The high court uses three examples of fundamentally unfair cases requiring automatic reversal: (1) introduction of coerced confessions; (2) complete denial of the right to counsel; or (3) adjudication by a biased judge. Such errors are not harmless as a matter of law. If the trial is fundamentally fair, however, then appellate courts can weigh the evidence to evaluate whether the error

was harmless beyond a reasonable doubt: "(error is harmless if, beyond a reasonable doubt, it 'did not *contribute to the verdict* obtained') . . . ." (478 U.S. at p. __ [92 L.Ed.2d at p. 471, 106 S.Ct. at p. 3106].)

This court recently recognized that *Garcia* and *Croy* are based upon the California Supreme Court's interpretation of the United States Constitution. (*People* v. *Herbst* (1986) 186 Cal.App.3d 793, 803, fn. 8 [233 Cal.Rptr. 123].) As we recognized in *Herbst,* the standard of review announced in *Garcia* and *Croy* has been superseded by *Rose* v. *Clark. Rose* v. *Clark* uses the *Chapman* standard for review of instructional error. ▇▇ Under both the state and the federal standards of review, the appellant has failed to demonstrate that the alleged error resulted in harm or prejudice or that it contributed to the verdict obtained.

▇▇ Appellant's final contention regarding intent is that the trial court failed to fulfil its sua sponte duty to instruct on the elements of the lesser included offense of second degree murder founded upon a theory of implied malice. The duty to instruct sua sponte on the elements of the lesser included offense does not arise where the evidence of the lesser included offense is minimal or insubstantial. (*People* v. *Flannel,* [1979] 25 Cal.3d 668, 684, fn. 12 [(160 Cal.Rptr. 84, 603 P.2d 1)]; CALJIC No. 17.10 (4th ed. 1986 pocket pt.) p. 65.)

There is no evidence in the record which would have supported a second degree murder conviction. Here, the trial court's duty to instruct sua sponte on the lesser included offense of second degree murder never arose because there was no evidence to support that theory.

IV.

INSTRUCTIONAL ERROR IN FAILING TO PROPERLY DEFINE
THE TERM "VIABLE FETUS."

On the charge that appellant murdered Annie's unborn child, the jury was instructed on the definition of murder as follows: "The crime of murder is the unlawful killing of a human being or a fetus with malice aforethought. In order to prove the commission of the crime of murder each of the following elements must be proved:

"One, that a human being or fetus was killed,

"Two, that the killing was unlawful, and

"Three, that the killing was done with malice aforethought."

A special instruction submitted by the People, which defined the term "fetus" to mean a "viable unborn child," was also read to the jury.

The essence of appellant's objection with respect to the special instruction used is that it failed to define the term "viable," a word with multiple meanings in lay conversation but a specialized meaning in the context of this case. As support for this proposition, appellant cites a number of authoritative linguistic sources to demonstrate the diverse meanings associated with the term viable. Appellant contends the trial court should have defined the term viable to mean an "unborn child . . . capable of independent existence outside the mother." Appellant argues that without a definition of viability the jury could have interpreted the instructions to mean that the question of viability would be shown by facts that the child was alive at the time of the killing. Appellant asserts that to be viable the fetus must also be capable of survival outside the womb.

Respondent disputes appellant's contention that the term viable is a term not used in everyday conversation or understood by the average lay person, and instead argues that the term viable is familiar to most adults in modern society. Moreover, respondent argues the record clearly establishes that the unborn child was viable, or capable of independent existence outside the womb, and, at any rate, any error was harmless because the evidence of viability was uncontroverted.

In *People* v. *Apodaca* (1978) 76 Cal.App.3d 479 [142 Cal.Rptr. 830], this court reviewed the defendant's conviction of murder of a human fetus. This court dismissed defendant's contentions that the trial court improperly instructed the jury on the definition of a viable fetus, and that under the Fourteenth Amendment the state's power to charge and convict a person of murdering an unborn child is limited to a fetus that is viable at the time of the killing. We concluded it was unnecessary to determine appellant's constitutional question in view of the fact that "the record . . . leads inescapably to the conclusion that the fetus was viable when appellant viciously attacked his former wife." (76 Cal.App.3d at p. 489.) We further rejected the defendant's argument that the court's failure to instruct in terms of viability was prejudicial because the evidence demonstrated that the fetus was between 22 and 24 weeks old, while, as a matter of constitutional law, viability of a fetus does not occur until it is at least 24 weeks old. "A fetus is viable when it has achieved the capability for independent existence; as we have indicated, a fetus is deemed viable when it is possible for it to survive the trauma of birth, although with artificial medical aid. It follows that whether a fetus is viable at a given time is a question of fact that is dependent upon the peculiar circumstances of each case." (76 Cal.App.3d at pp. 489-490.)

In *People* v. *Smith* (1976) 59 Cal.App.3d 751 [129 Cal.Rptr. 498], the Second District reviewed a trial court's order dismissing a charge of murder of a human fetus. The court phrased the issue as "whether violent and unconsented abortion of a nonviable fetus is murder." (59 Cal.App.3d at p. 755.) In affirming the trial court's order of dismissal, the Court of Appeal construed the term fetus, as used in Penal Code section 187, to refer to a viable unborn child. (59 Cal.App.3d at pp. 757-759.) The court noted that the definition of viability is well-established: " '[H]aving attained such form and development of organs as to be normally capable of living outside the uterus.' " (59 Cal.App.3d at p. 758, citing Webster's Third New Internat. Dict. (1966 ed.) p. 2548.) The *Smith* and *Apodaca* courts also referred to the language of the United States Supreme Court in *Rowe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705] that viability means being capable of surviving the trauma of birth with the aid of normal medical science. (*People* v. *Smith, supra,* 59 Cal.App.3d at pp. 756-758; *People* v. *Apodaca, supra,* 76 Cal.App.3d at pp. 487-490.)

This court can take judicial notice of the fact that the concept of a viable fetus has gained wide public exposure in the national debate over abortion. We cannot, however, hold as a matter of law that the term viable has a common meaning in ordinary and everyday usage. The very crux of the abortion debate is the meaning of the word viable. The United States Supreme Court and the appellate courts of this state have devoted great care and effort defining the idea of a viable fetus.

The term viable is at once simple to understand yet elusive. For this court to hold that the term viable has a common and ordinary meaning in everyday usage, we would have to take judicial notice of that fact. We must decline the invitation to do so.

The trial court should have instructed the jury as to the legal definition of the term viable. The trial judge has a sua sponte duty to instruct the jury as to all essential elements of the charged offense. (*People* v. *Hamilton* (1978) 80 Cal.App.3d 124, 133 [145 Cal.Rptr. 429].) Viability of a fetus is a constitutional prerequisite for murder of a fetus by logical extension of *Rowe* v. *Wade, supra,* 410 U.S. 113. The trial court erred in failing to instruct the jury as to the legal meaning of the term viable.

■ Nevertheless, appellant has not suffered prejudice, for the record clearly demonstrates the existence of the element of viability of the fetus, and there is no evidence deserving of any consideration whatsoever from which the jury could have found in appellant's favor on this point. (*People* v. *Thornton, supra,* 11 Cal.3d 738, 769, fn. 20; *People* v. *Garcia, supra,* 36

Cal.3d 539, 555-556; *People* v. *Phillips* (1966) 64 Cal.2d 574, 584-585 [51 Cal.Rptr. 225, 414 P.2d 353].)

In *Apodaca,* this court noted that there was "nothing in the record remotely to suggest that appellant had any medical evidence to prove that the fetus was not viable at the time of the brutal attack .... On the other hand ... the pathologist ... gave a scholarly and knowledgeable discussion on the subject of fetus viability and then emphatically expressed the opinion that the fetus was viable when it was slain; the doctor substantiated his opinion with well-accepted medical reasons, including body measurements." (76 Cal.App.3d at pp. 487-488.)[8]

The examination of Dr. Rajani, the neonatologist, included the following passage pertaining to the unborn child's ability to survive: "Q [Mr. Freed, prosecutor] Have you had an occasion to review autopsy reports written by Dr. Jerry Nelson concerning Deann Skaggs and her unborn fetus?

"A Yes, I have.

"Q Based on all of the facts you find in those reports by Dr. Nelson would it be possible for you to estimate the age of the fetus?

"A Based on the weight which has been quoted in the reports, and this would just be a—really an estimate, but 28 to 30 weeks gestation.

"Q Based on your reading of those reports and the information therein did you form any opinion as to the ability of the fetus to survive independent of the mother?

"A In our experience babies born with that weight have an 85 percent survival rate.

"Q Is that then your opinion, that the fetus was viable?

"A There is an 85 percent chance that it was, yes.

---

[8]Regarding appellant's contention that he was denied the opportunity to present evidence on the issue of viability by virtue of the trial court's denial of appellant's motion to disinter the fetal remains, the trial court denied appellant's motion because he had failed to demonstrate the remotest possibility that exhuming the remains would have reasonably led to the discovery of credible evidence on the issue of viability. Furthermore, the trial court denied the motion without prejudice and reserved appellant's opportunity to refile the motion at a future date. Appellant declined to avail himself of the opportunity. Also, the record indicates that appellant had access both to the pathologist's report on the autopsy of the fetus as well as any representative tissue sections and organs preserved by the pathologist.

"Q Like to ask you, Doctor, if—if a mother dies, how long in your opinion would it be until brain death ensued in a fetus?

"A It would take about 15 minutes."

During cross-examination of Dr. Rajani by defense counsel, the following exchange took place:

"Q [Mr. Brown:] Doctor, by that do you mean in the event the mother died if you were able to extract the fetus from the womb within 15 minutes there would then be an 85 percent chance of survival in this case?

"A Uh, yeah, I would say so, yes."

Although Dr. Rajani did not express the opinion that the fetus was 100 percent viable, as in *Apodaca,* he nevertheless made clear that the fetus had an 85 percent chance to survive independent of the womb. In the absence of any contrary evidence, such evidence constitutes proof beyond a reasonable doubt on the issue of viability.

The matter is further supported by other evidence in the record, including the pathologist's testimony that the fetus was well developed internally and externally, had no congenital abnormalities, and gave every indication that it would have survived had the pregnancy continued to term. Dr. Roger Franz, Annie's obstetrician, testified that the fetus's heart tones were excellent when he examined it on the date of the murder, and the pregnancy was proceeding properly. Furthermore, the Supreme Court in *Rowe* v. *Wade, supra,* 410 U.S. 113, at page 160 [35 L.Ed.2d at p. 493], noted that generally viability of a human fetus occurs when the fetus is between 24 and 28 weeks old. In the instant case, the testimony of Drs. Nelson and Rajani indicated that the gestation of the fetus was at least 28 weeks to 30 weeks. In light of such persuasive and overwhelming evidence, the error was not prejudicial.

V.

APPLICABILITY OF THE MULTIPLE-MURDER SPECIAL CIRCUMSTANCE.

 Appellant contends that the multiple-murder special circumstance set forth in Penal Code section 190.2, subdivision (a)(3), which requires that the defendant "has in this proceeding been convicted of more than one offense of murder in the first or second degree," is not applicable to the killing, by a single act, of a mother and her fetus. The premise of appellant's argument is that section 187, subdivision (a), of the Penal Code, which provides that murder is the "unlawful killing of a human being, or a fetus,"

does not have the same meaning as the term "offense of murder" in section 190.2, subdivision (a)(3).

Appellant argues that all other states require specific reference to the term fetus before criminal liability can be imputed for killing a fetus. He contends that because Penal Code section 190.2, subdivision (a)(3), does not expressly use the word fetus, fetal murder cannot be used to justify the multiple-murder special circumstance. In effect, appellant contends that he has been denied notice under the special circumstance section that a fetus may be counted in determining whether multiple murders have taken place.

The principle that our population is entitled to notice of that conduct which is proscribed is fundamental to the Fourteenth Amendment to the United States Constitution: "Engrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges." (*Lambert* v. *California* (1957) 355 U.S. 225, 228 [2 L.Ed.2d 228, 231, 78 S.Ct. 240].) Starting from this premise, we nevertheless reject appellant's interpretation and construction of the multiple-murder special circumstance found in Penal Code section 190.2, subdivision (a)(3).

The multiple-murder special circumstance expressly requires conviction of more than one offense of murder in the first or second degree. Under Penal Code section 187, subdivision (a), murder is defined as the "unlawful killing of a human being, or a *fetus,* with malice aforethought." (Italics added.) Appellant was found guilty of two separate counts of first degree murder. He was found guilty in the second count of first degree murder of a fetus. The multiple-murder special circumstance requires more than one conviction of *murder* in the first or second degree.

The two sections are clear on their face. First degree murder of a fetus is still murder. If the fetal murder is in the first or second degree, it can serve as "more than one offense of murder." (Pen. Code, § 190.2, subd. (a)(3).) The appellant had statutory notice that killing a fetus with malice aforethought is murder. The multiple-murder special-circumstance section merely requires more than one murder.

Read together, the two statutes are clear and unambiguous. Appellant had statutory notice that the killing of a fetus with malice aforethought was murder. He also had statutory notice that multiple murders in the first or second degree created the possibility of an additional special circumstance charge with the possibility of death or life imprisonment.

We agree with the position of the Attorney General that any other interpretation of the statute would unnecessarily destroy the plain meaning of a

statute that does not require further judicial construction. The meaning of murder in the multiple-murder special circumstance is derived from Penal Code section 187, subdivision (a). Both sections are facially clear and unambiguous. ▮ Judicial interpretation is not necessary where the meaning of words is plain and unambiguous. (*People* v. *Chadd* (1981) 28 Cal.3d 739, 746 [170 Cal.Rptr. 621 P.2d 837]; *People* v. *Belleci* (1979) 24 Cal.3d 879, 887-888 [157 Cal.Rptr. 503, 598 P.2d 473].) ▮ Appellant was unequivocally on statutory notice that killing a fetus with malice aforethought is murder and that multiple murder would subject him to a special circumstance charge. We find that the appellant had statutory notice that the act of murdering a pregnant victim would justify the filing of an allegation of multiple-murder special circumstances.

▮ Appellant further complains that the *single act* of murdering an expectant mother cannot be a double homicide for purposes of the multiple-murder special circumstance. Appellant argues that the one act of killing a pregnant victim cannot simultaneously count as a second murder for the feticide. He asserts that he is denied notice under section 190.2, subdivision (a)(3), that his single act of homicide can count as multiple killings where the victim is pregnant.

This argument must also be rejected. Although some jurisdictions hold that one may only be charged once for a single criminal act involving more than one victim, California has followed the rule that one illegal act harming multiple persons constitutes a multiple offense justifying separate charges. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 589 [180 Cal.Rptr. 266, 639 P.2d 908].) In *Ramos*, the Supreme Court rejected the argument that Penal Code section 654's prohibition of multiple punishment for a single crime barred conviction where multiple robbery victims were involved. Even where multiple victims are in joint possession of a single item of property, as in the *Ramos* case, each victim is placed in fear or forced to surrender possession. Thus, the fact that there are multiple victims justifies multiple charges for the single act.

In *People* v. *Majors* (1884) 65 Cal. 138 [3 P. 597], the defendant had counselled two others to rob William Renowden. During the robbery, the accomplices killed Renowden and Archibald McIntyre. Majors was not present during the robbery. He was convicted during separate trials for each murder. Contemporary courts would obviously view the issues of multiple prosecution and intent to kill in a far different light than they did in 1884. The Penal Code has gone through substantial revisions between 1884 and the present. The *Majors* case, however, stands as authority for the proposition that a single criminal act is sufficient to constitute two offenses of murder. (*Id.* at pp. 146-147; see Annot. (1981) 8 A.L.R.4th 960, 964-967, 970-974.)

Procedurally, courts now require multiple counts rather than multiple prosecutions. The *Majors* holding that multiple charges are permitted where a single act harms multiple victims has not changed with time. Just as in *Ramos* and *Majors,* there were multiple victims in the instant action. As discussed in part III of this opinion, appellant was intimately familiar with the fact of and the duration of Annie Skaggs's pregnancy. Furthermore, the very motivation for this murder was to rid the father-to-be of the responsibility of caring for the future child.

We hold that the single act of murdering a victim known to the defendant to be pregnant constitutes a multiple homicide for purposes of Penal Code section 190.2, subdivision (a)(3). We further hold that Penal Code sections 187, subdivision (a), and 190.2, subdivision (a)(3), provided appellant with clear and unambiguous notice that the murder of a pregnant victim in the first degree and of her fetus in the first degree constituted a multiple murder entitling the People to file a multiple-murder special-circumstance allegation.

## VI.-IX.*

. . . . . . . . . . . . . . . . . . .

### DECISION

The judgment is affirmed.

Woolpert, Acting P. J., and Martin, J., concurred.

A petition for a rehearing was denied February 24, 1987, and appellant's petition for review by the Supreme Court was denied April 16, 1987.

---

*See footnote on page 1495, *ante.*