**STATE of Minnesota, Plaintiff,**

v.

**Sean Patrick MERRILL, Defendant.**

**No. C7–89–766.**

Supreme Court of Minnesota.

Jan. 19, 1990.

**320**

Kevin A. Lund, Patterson, Restovich, Lund Law Offices, Ltd., Asst. Olmsted County Public Defender, Rochester, for defendant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Raymond F. Schmitz, Olmsted County Atty., Rochester, for plaintiff.

SIMONETT, Justice.

Defendant has been indicted for first- and second-degree murder of Gail Anderson and also for first- and second-degree murder of her "unborn child." The trial court denied defendant's motion to dismiss the charges relating to the unborn child but certified for appellate review two questions:

1. Do Minn.Stat. §§ 609.2661(1) and .2662(1) (1988) [the unborn child homicide statutes] violate the fourteenth amendment of the United States Constitution as interpreted by the United States Supreme Court in *Roe v. Wade,* by failing to distinguish between viable fetuses and nonviable fetuses and embryos, and by treating fetuses and embryos as persons?

2. Are [said statutes] void for vagueness?

On November 13, 1988, Gail Anderson died from gunshot wounds allegedly inflicted by the defendant. An autopsy revealed Ms. Anderson was pregnant with a 27- or 28–day–old embryo. The coroner's office concluded that there was no abnormality which would have caused a miscarriage, and that death of the embryo resulted from the death of Ms. Anderson. At this stage of development, a 28–day–old embryo is 4- to 5–millimeters long and, through the umbilical cord, completely dependent on its mother. The Anderson embryo was not viable. Up to the eighth week of development, it appears that an "unborn child" is referred to as an embryo; thereafter it is called a fetus. The evidence indicates that medical science generally considers a fetus viable at 28 weeks following conception although some fetuses as young as 20 or 21 weeks have survived. The record is unclear in this case whether either Ms. Anderson or defendant Merrill knew she was pregnant at the time she was assaulted.

Defendant was indicted for the death of Anderson's "unborn child" under two statutes entitled, respectively, "Murder of an Unborn Child in the First Degree"[1] and "Murder of an Unborn Child in the Second Degree."[2] These two statutes, enacted by the legislature in 1986, follow precisely the language of our murder statutes, except that "unborn child" is substituted for "human being" and "person." *See* footnote 4, *infra.* The term "unborn child" is defined as "the unborn offspring of a human being

---

1. Minn.Stat. § 609.2661 (1988), provides in part:
Whoever does any of the following is guilty of murder of an unborn child in the first degree and must be sentenced to imprisonment for life:
(1) causes the death of an unborn child with premeditation and with intent to effect the death of the unborn child or of another;
* * *.

2. Minn.Stat. § 609.2662 (1988), provides in part:
Whoever does either of the following is guilty of murder of an unborn child in the second degree and may be sentenced to imprisonment for not more than 40 years:
(1) causes the death of an unborn child with intent to effect the death of that unborn child or another, but without premeditation;
* * *.

conceived, but not yet born." Minn.Stat. § 609.266(a) (1988).

This legislative approach to a fetal homicide statute is most unusual and raises the constitutional questions certified to us. Of the 17 states that have codified a crime of murder of an unborn, 13 create criminal liability only if the fetus is "viable" or "quick." Additionally, two noncode states have expanded their definition of common law homicide to include viable fetuses. *See Commonwealth v. Cass*, 392 Mass. 799, 467 N.E.2d 1324 (1984); *State v. Horne*, 282 S.C. 444, 319 S.E.2d 703 (1984). Arizona and Indiana impose criminal liability for causing the death of a fetus at any stage, as does Minnesota, but the statutory penalty provided upon conviction is far less severe. Ariz.Rev.Stat.Ann. § 13–1103(A)(5) (1989) (5–year sentence); Ind.Code Ann. § 35–42–1–6 (Burns 1985) (2–year sentence).

■ Before discussing the Minnesota statutes, three preliminary observations must be made. First, to challenge successfully the constitutional validity of a statute, the challenger bears the very heavy burden of demonstrating beyond a reasonable doubt that the statute is unconstitutional. *E.g., Wegan v. Village of Lexington*, 309 N.W.2d 273, 279 (Minn.1981); *Contos v. Herbst*, 278 N.W.2d 732, 736 (Minn.1979), *appeal dismissed sub nom., Prest v. Herbst*, 444 U.S. 804, 100 S.Ct. 24, 62 L.Ed.2d 17 (1979). Second, there are no common-law crimes in this state. Minnesota is a "code state," *i.e.*, the legislature has exclusive province to define by statute what acts constitute a crime. *State v. Soto*, 378 N.W.2d 625, 627 (Minn.1985). And, third, the role of the judiciary is limited to deciding whether a statute is constitutional, not whether it is wise or prudent legislation. *AFSCME Councils 6, 14, 65, and 96 AFL–CIO v. Sundquist*, 338 N.W.2d 560, 570 (Minn.1983). We do not sit as legislators with a veto vote, but as judges deciding whether the legislation, presumably constitutional, is so.

### I.

Defendant first contends that the unborn child homicide statutes violate the Equal Protection Clause. Defendant premises his argument on *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), which, he says, holds that a nonviable fetus is not a person. He then argues that the unborn child criminal statutes have impermissibly "adopted a classification equating viable fetuses and nonviable embryos with a person."[3]

Assuming the relevance of defendant's stated premise, defendant has failed to show that the statutory classification impinges upon any of his constitutional rights. The equal protection clause of the Fourteenth Amendment requires that all persons similarly situated be treated alike under the law. *Matter of Harhut*, 385 N.W.2d 305, 310 (Minn.1986). Defendant does not claim, nor can he, that he is within the class the statutes are designed to benefit, namely, unborn children. Rather, it appears, defendant is claiming he is in the class burdened by the law.

If we understand defendant correctly, he is claiming the statutory classification, by not distinguishing between viable and nonviable fetuses, exposes him to conviction as a murderer of an unborn child during the first trimester of pregnancy, while others who intentionally destroy a nonviable fetus, such as a woman who obtains a legal abortion and the doctor who performs it, are not murderers. In other words, defendant claims the unborn child homicide statutes expose him to serious penal consequences, while others who intentionally terminate a nonviable fetus or embryo are not subject to criminal sanctions. In short, defendant claims similarly situated persons are treated dissimilarly.

■ We disagree. The situations are not similar. The defendant who assaults a pregnant woman causing the death of the fetus she is carrying destroys the fetus without the consent of the woman. This is not the same as the woman who elects to

---

**3.** In the trial court, defendant also raised issues relating to substantive due process and cruel and unusual punishment. The trial judge did not certify those issues to us.

have her pregnancy terminated by one legally authorized to perform the act. In the case of abortion, the woman's choice and the doctor's actions are based on the woman's constitutionally protected right to privacy. This right encompasses the woman's decision whether to terminate or continue the pregnancy without interference from the state, at least until such time as the state's important interest in protecting the potentiality of human life predominates over the right to privacy, which is usually at viability. *Roe v. Wade,* 410 U.S. at 163, 93 S.Ct. at 731. *Roe v. Wade* protects the woman's right of choice; it does not protect, much less confer on an assailant, a third-party unilateral right to destroy the fetus.

■ As defendant points out, the United States Supreme Court has said that an unborn child lacks "personhood" and is not a person for purposes of the Fourteenth Amendment. *Roe v. Wade,* 410 U.S. at 158, 93 S.Ct. at 729. The focus of that case, however, was on protecting the woman from governmental interference or compulsion when she was deciding whether to terminate or continue her pregnancy. "[T]he right in *Roe v. Wade* can be understood only by considering both the woman's interest and the nature of the State's interference with it." *Maher v. Roe,* 432 U.S. 464, 473, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977). Significantly, the *Roe v. Wade* court also noted that the state "has still *another* important and legitimate interest in protecting the potentiality of human life." *Roe v. Wade,* 410 U.S. at 162, 93 S.Ct. at 731 (emphasis in original). Even laws which directly impact on abortion are constitutional so long as the statute itself does not impinge on the woman's decision. *See, e.g., Webster v. Reproductive Health Services,* —— U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (state prohibition of use of public facilities and employees to perform abortion unless life of woman endangered upheld). In our case, the fetal homicide statutes seek to protect the "potentiality of human life," and they do so without impinging directly or indirectly on a pregnant woman's privacy rights.

■ The state's interest in protecting the "potentiality of human life" includes protection of the unborn child, whether an embryo or a nonviable or viable fetus, and it protects, too, the woman's interest in her unborn child and her right to decide whether it shall be carried *in utero.* The interest of a criminal assailant in terminating a woman's pregnancy does not outweigh the woman's right to continue the pregnancy. In this context, the viability of the fetus is "simply immaterial" to an equal protection challenge to the feticide statute. *Smith v. Newsome,* 815 F.2d 1386, 1388 (11th Cir. 1987).

We conclude that sections 609.2661(1) and 609.2662(1) do not violate the Fourteenth Amendment by failing to distinguish between a viable and a nonviable fetus.

## II.

A more difficult issue, as the trial court noted, is whether the unborn child criminal statutes are so vague as to violate the Due Process Clause of the Fourteenth Amendment. Defendant claims the statutes are unconstitutionally vague because they fail to give fair warning of the prohibited conduct and because they encourage arbitrary and discriminatory enforcement.

■ A state criminal statute is void for vagueness if it fails to define the criminal offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). A statute imposing criminal penalties must meet a high standard of certainty. *State v. Newstrom,* 371 N.W.2d 525, 528 (Minn.1985). If the description of the forbidden conduct is vague, *Interstate Circuit, Inc. v. City of Dallas,* 390 U.S. 676, 689–90, 88 S.Ct. 1298, 1306, 20 L.Ed.2d 225 (1968), or if its wording leaves doubt as to which persons fall within the scope of the law, *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939), the statute may violate the Due Process Clause.

## A.

Defendant first contends that the statutes fail to give fair warning to a potential violator. Defendant argues it is unfair to impose on the murderer of a woman an additional penalty for murder of her unborn child when neither the assailant nor the pregnant woman may have been aware of the pregnancy.

■ The fair warning rule has never been understood to excuse criminal liability simply because the defendant's victim proves not to be the victim the defendant had in mind. Homicide statutes generally provide that a person is guilty of first- or second-degree murder upon proof that the offender caused the death of a person with intent to cause the death of that person *or another. See, e.g., State v. Sutherlin*, 396 N.W.2d 238, 240 (Minn.1986). Because the offender did not intend to kill the particular victim, indeed, may not even have been aware of that victim's presence, does not mean that the offender did not have fair warning that he would be held criminally accountable the same as if the victim had been the victim intended. W. LaFave & A. Scott, *Handbook on Criminal Law* 254 (1972).

■ In this case, the indictments charge defendant for first and second degree murder of an unborn child under section 609.2661(1) and section 609.2662(1) for causing the death of an unborn child with "intent to effect the death of the unborn child or another, to-wit: Gail Stephanie Anderson, an adult female." [4] Ordinarily, the doctrine of transferred intent applies when the intent being transferred is for the same type of harm. If the harms are different, intent is not transferable. W. LaFave, *supra*, at 243. For example, an intent to murder cannot substitute for the intent required to convict for the malicious destruction of property that may have inadvertently been damaged during the murderous assault. In this case, defendant seems to be arguing that an intent to kill the mother is not transferable to the fetus

because the harm to the mother and the harm to the fetus are not the same. We think, however, the harm is substantially similar. The possibility that a female homicide victim of childbearing age may be pregnant is a possibility that an assaulter may not safely exclude. We conclude, therefore, that the statutes provide the requisite fair warning.

## B.

■ Defendant next contends that the unborn child criminal statutes are fatally vague because they do not define the phrase "causes the death of an unborn child." As a result, defendant argues, the statutes invite or permit arbitrary and discriminatory enforcement. *See, e.g., State v. Peterfeso*, 283 Minn. 499, 501–02, 169 N.W.2d 18, 19 (1969).

Defendant argues that the statute leaves uncertain when "death" occurs, or, for that matter, when "life" begins. People will differ on whether life begins at conception or at viability. People may differ on whether death is the cessation of brain activity (an activity not present in an embryo) or the cessation of a functioning circulatory system. The problem, says defendant, is that absent statutory criteria, judges and juries will provide their own definitions which will differ, leaving the statutes vulnerable to arbitrary and discriminatory enforcement. This argument, we think, attempts to prove too much.

Some background is necessary to put the issue in its proper perspective. In 1985 this court, in *State v. Soto*, 378 N.W.2d 625 (Minn.1985), held that when the legislature referred to the death of a "human being" in the homicide statutes, the term "human being" was being used in its well-established common-law sense of a person born alive. Consequently, we held that the homicide statutes did not apply to the death of an 8–month–old fetus yet unborn. The legislature was free, of course, if it wished to do so, to create a crime to cover feticide.

**4.** Apparently the parties agree that the word "another," as it is used in the feticide statutes, refers to another person.

Traditionally, the crime of feticide imposed criminal liability for the death of a "viable" fetus, that is, a fetus at that stage of development which permits it to live outside the mother's womb, or a fetus that has "quickened," that is, which moves within the mother's womb.

Apparently in response to *Soto,* the legislature has enacted criminal statutes to cover feticide. In so doing, it has enacted very unusual statutes which go beyond traditional feticide, both in expanding the definition of a fetus and in the severity of the penalty imposed. The statutes in question impose the criminal penalty for murder on whoever causes the death of "the unborn offspring of a human being conceived, but not yet born."

Whatever one might think of the wisdom of this legislation, and notwithstanding the difficulty of proof involved, we do not think it can be said the offense is vaguely defined. An embryo or nonviable fetus when it is within the mother's womb is "the unborn offspring of a human being." Defendant argues, however, that to cause the death of an embryo, the embryo must first be living; if death is the termination of life, something which is not alive cannot experience death. In short, defendant argues that causing the death of a 27-day-old embryo raises the perplexing question of when "life" begins, as well as the question of when "death" occurs.

■■■ The difficulty with this argument, however, is that the statutes do not raise the issue of when life as a *human person* begins or ends. The state must prove only that the implanted embryo or the fetus in the mother's womb was living, that it had life, and that it has life no longer. To have life, as that term is commonly understood, means to have the property of all living things to grow, to become. It is not necessary to prove, nor does the statute require, that the living organism in the womb in its embryonic or fetal state be considered a person or a human being. People are free to differ or abstain on the profound philosophical and moral questions of whether an embryo is a human being, or on whether or at what stage the embryo or fetus is en-souled or acquires "personhood". These questions are entirely irrelevant to criminal liability under the statute. Criminal liability here requires only that the genetically human embryo be a living organism that is growing into a human being. Death occurs when the embryo is no longer living, when it ceases to have the properties of life.

Defendant wishes to argue that causing the death of a living embryo or nonviable fetus in the mother's womb should not be made a crime. This is an argument, however, that must be addressed to the legislature. Our role in the judicial branch is limited solely to whether the legislature has defined a crime within constitutional parameters. Indeed, in this case, our role is further limited to answering only the two specific questions certified to us for a ruling. We answer both questions no.

Certified questions answered.

KELLEY, J., concurs in part, dissents in part.

WAHL and KEITH, JJ., dissent.

KELLEY, Justice (concurring in part, dissenting in part):

I concur in the majority opinion that Minn.Stat. §§ 609.2661(3) and .2662 (1988) do not violate the Equal Protection Clause of the United States Constitution. Likewise, I concur in the conclusion that the two statutes on their face are not void as violative of the Due Process Clause. Therefore, I join Part I and Part II A of the Court's opinion. However, because I conclude that the unborn child criminal statutes are fatally vague so as to invite, or permit, arbitrary and discriminatory enforcement, I would hold they unconstitutionally infringe upon the Due Process Clause, and, accordingly, would reverse. *See Giaccio v. Pennsylvania,* 382 U.S. 399, 402–03, 86 S.Ct. 518, 520–21, 15 L.Ed.2d 447 (1966); *State v. Peterfeso,* 283 Minn. 499, 501, 169 N.W.2d 18, 19 (1969).

Each of the statutes under attack in this appeal employs the phrase "causes the death of an unborn child." As appellant points out, neither statute defines the phrase, nor does either set out particular-

ized standards to afford guidance to a court or a jury for use in construing the phrase. In short, both statutes leave when "death" occurs, or, for that matter, when "life" commences undefined. Absent such definition, it seems to me the phrase "causes the death of an unborn child" is burdened with ambiguity which, by its very nature, invites arbitrary and discriminatory enforcement. The result, as I see it, is that by necessity trial courts are left to wrestle with metaphysical, medical and legal concepts relative to the commencement and cessation of life in order to apply these statutes in a criminal prosecution.

The statutes' ambiguous phraseology almost inevitably requires at some point during the criminal proceeding involving a charge of feticide that the trial judge, in order to administer them, determine when life begins in order to rule on motions or to structure jury instructions. Without adequate definitional standards for guidance, it is not only possible, but probable, in my opinion, that different judges might resolve the issue differently. A representative but nonexclusive listing of types of issues likely to arise in the course of a feticide prosecution include: Should death be defined as cessation of brain activity? Is there life before brain activity? Should death be defined as a cessation of function of the circulatory system? If so, is there life before that even though brain activity has not been commenced? Does life not commence until viability and death only when the fetus is destroyed thereafter? Does life commence at the moment of conception and death occur when the embryo is thereafter exterminated? The fact that any of these and, perhaps, other similar questions may be logically answered in the affirmative, I think, serves to illustrate that, absent statutory criteria, the present statute permits judges freedom to make rulings and charge juries according to their own predilections; and juries are free to decide what conduct is prohibited in each case—results that are, or could be, both arbitrary and discriminatory. *See, e.g., Peterfeso,* 283 Minn. at 501, 169 N.W.2d at 19.

It cannot be gainsaid that few topics today compel as fierce public debate and evoke the passionate convictions of as many of our citizens as does the issue of when "life" in a fetus begins. In view of the stridency of that debate, it appears conceivable, perhaps even predictable, that two juries having the same evidence could arrive at the same factual conclusions, but due to divergent and strongly held beliefs arrived at a dissimilar legal result. By way of example, in the case before us, one jury sharing a common viewpoint of when life commences could find the defendant guilty of fetal murder, whereas another whose members share the view that life was nonexistent in a 26 to 28–day–old embryo, could exonerate the appellant.

The likelihood of discriminatory enforcement is further enhanced when the discretionary charging function possessed by a grand jury is considered. The decision to charge must be concurred in by only a majority of the panel. Minn.R.Crim.P. 18.-07. Thus, the decision to charge or not may well pivot on the personal philosophical and moral tenets of a majority of the potential panel—a majority whose beliefs may vary from grand jury panel to grand jury panel.

By my count, 12 of the 15 states which have feticide statutes have variously imposed criminal liability for causing the death of an unborn fetus based on whether the fetus is "viable" or "quick." Such statutes are more likely to pass constitutional muster because they provide an objectively ascertainable point during the maturation of the fetus which will trigger culpability. Counsel for appellant has suggested that in the interest of upholding the constitutionality of the statutes we "read into" them a fetus viability requirement, which, in effect, would generally limit prosecution for fetal "death" after viability, and, specifically, in this case would result in the dismissal of Counts II and IV of the indictment. The majority opinion did not directly discuss this contention, and, I think properly so. Generally, determination of the factual predicate for criminal responsibility is within the province of the legislature, and not in the courts by a strained judicial "construction."

Recently, in *State v. Olson,* 435 N.W.2d 530 (Minn.1989), we declined to construe

the word "death," as it appears in the "general" homicide statute, as brain death, but instead left the development of the appropriate definition to the legislature. In so doing, we noted that where " * * * the issue raised is of profound human interest, prudence dictates, we think, that the legislature should first be given an opportunity to consider the legal implications of brain death." *Id.* at 535. For reasons similar to those therein expressed, I think the proper forum for defining life's onset and its cessation in these feticide statutes is the legislature.

In conclusion, I would answer the second certified question in the affirmative.

WAHL, Justice (dissenting).

The trial court, in the order certifying the two issues before us for appellate review, noted that "the Minnesota crimes against unborn children statutes represent the most sweeping legislative attempt in the country to criminalize actions of third parties which harm fetuses and embryos." We are asked to determine whether two of those statutes pass constitutional muster. Because I conclude that they do not, I respectfully dissent. I concur with the dissenting opinion of Justice Kelley in its conclusion that Minn.Stat. §§ 209.2661(1) (Murder of Unborn Child in First Degree) and 209.2662(1) (1988) (Murder of Unborn Child in Second Degree), as drafted, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution under the "void for vagueness" doctrine. I would also answer the first certified question in the affirmative.

The first question certified asks:

Do Minn.Stat. §§ 609.2661(1) and 609.-2662(1) (1988) violate the fourteenth amendment of the United States Constitution, as interpreted by the United States Supreme Court in *Roe v. Wade,* by failing to distinguish between viable fetuses and nonviable fetuses and embryos, and by treating fetuses and embryos as persons?

The majority opinion, in answering this question, has focused solely on defendant's equal protection claim and finds no violation of the Fourteenth Amendment on that ground. Assuming the court's analysis has properly addressed defendant's equal protection concerns, the question as certified to us also raises a question of substantive due process. The constitutional requirement of due process not only concerns matters of criminal procedure, but also limits "the manner and extent to which conduct may be defined as criminal in the substantive criminal law." W. LaFave & A. Scott, *Criminal Law* § 20 at 136 (1972). By failing to distinguish between viable fetuses and nonviable fetuses and embryos, sections 609.2661(1) and 609.2662(1) have run afoul of the defendant's right to substantive due process.

Defendant is charged with murder of an unborn child in the first degree carrying a sentence of life imprisonment, Minn.Stat. § 609.2661(1), and murder of an unborn child in the second degree, carrying a sentence of imprisonment for not more than 40 years, Minn.Stat. § 609.2662(1).[1] These statutes track, respectively, the language and sentences of murder in the first degree, Minn.Stat. § 609.185(1) (1988), and murder in the second degree, Minn.Stat. § 609.19(1) (1988), with one exception. In both sections 609.2661(1) and 609.2662(1), the actor, to be guilty of murder and to be sentenced for murder, must cause the death, not of a human being, but of an unborn child. An unborn child is the unborn offspring of a human being conceived, but not yet born. Minn.Stat. § 609.266(a) (1988). Thus an unborn child can be a fertilized egg, an embryo, a nonviable fetus or a viable fetus.

The law with regard to murder is clear. Murder is the "unlawful killing of a human being by another * * *." *Black's Law Dictionary* 918 (5th ed. 1979). The term murder implies a felonious homicide, *Pilcher v. State,* 16 Ala.App. 237, 238, 77 So. 75, 76 (1917), which is the wrongful killing of a human being. 4 W. Blackstone, *Commen-*

---

**1.** Sections 609.2661(1) and 609.2662(1) are criminal statutes. Criminal statutes must be strictly construed in favor of the defendant. LaFave & Scott, 1 *Substantive Criminal Law* § 2.2(d) at 108 (1986).

*taries* *188–89. A nonviable fetus is not a human being, nor is an embryo a human being, nor is a fertilized egg a human being. None has attained the capability of independent human life. *People v. Smith*, 59 Cal.App.3d 751, 756, 129 Cal.Rptr. 498, 502 (1976). Each has the potentiality of human life. In this potential human life the state has an important and legitimate interest—an interest which becomes compelling at viability. *Roe v. Wade*, 410 U.S. 113, 162–163, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973). Only at viability does the fetus have the "capability of meaningful life outside the mother's womb." *Id.* 410 U.S. at 163, 93 S.Ct. at 732. As one constitutional scholar has put it, "viability constitutes nothing less than the operative fact that makes a fetus like other human beings, and that therefore requires that a fetus be accorded state protection similar to that accorded the rest of humanity." L. Tribe, *American Constitutional Law* § 15–10 at 1357 (1988).

Though the statute under which the court in *People v. Smith* concluded that only a viable fetus could become an object of murder differs from Minnesota's fetal homicide statutes, the court's analysis is relevant on this point:

> The underlying rationale of *Wade*, therefore, is that until viability is reached, human life in the legal sense has not come into existence. Implicit in *Wade* is the conclusion that as a matter of constitutional law the destruction of a non-viable fetus is not a taking of human life. It follows that such destruction cannot constitute murder or other form of homicide, whether committed by a mother, a father (as here), or a third person.

*People v. Smith*, 59 Cal.App.3d at 757, 129 Cal.Rptr. at 502. Our decisions have recognized this principle. In a civil case we have allowed the personal representative of an "unborn child" to maintain a wrongful death action. *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W.2d 838 (1949). We concluded in *Verkennes* that a cause of action would only arise "where independent existence is possible * * *." *Id.* at 370–71, 38 N.W.2d at 841.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." Life, liberty and property are fundamental rights. "When a fundamental right is involved, due process requires a state to justify any action affecting that right by demonstrating a compelling state interest." *Garner v. Memphis Police Dept.*, 710 F.2d 240, 247 (6th Cir.1983), *aff'd on other grounds sub nom. Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (invalidating on due process grounds a statute authorizing the police to use deadly force against any felon fleeing arrest). "Laws which infringe on fundamental rights must be 'narrowly drawn to express only the legitimate state interests at stake.'" *Id.* 710 F.2d at 247 (quoting *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)).

The fundamental right involved in the case before us as far as defendant is concerned is his liberty. He is charged with two counts of murder of a woman who was 26 to 28 days pregnant at the time of her death. For the death of the 28–day embryo he is further charged with murder of an unborn child in the first degree and murder of an unborn child in the second degree for which he may be sentenced to life imprisonment and 40 years. The state does not have a compelling interest in this potential human life until the fetus becomes viable. *Roe v. Wade*, 410 U.S. at 162–163, 93 S.Ct. at 731. Sections 609.-2661(1) and 609.2662(1) are not narrowly drawn to distinguish between viable fetuses, nonviable fetuses and embryos, so as to express "only the legitimate state interests at stake." Unless the words "unborn child" in sections 609.2661(1) and 609.-2662(1) are construed to read "viable unborn child," the reach of these statutes is unconstitutionally broad. The first certified question must be answered in the affirmative.

KEITH, Justice.

I concur in the dissent of Justice WAHL.